THE CITY OF EAST ORANGE AND MAYOR AND CITY COUNCIL, ETC., PLAINTIFFS-RESPONDENTS, v. THE BOARD OF WATER COMMISSIONERS, ETC., DEFENDANT-RESPONDENT, AND EAST ORANGE GOLF ASSOCIATION, DEFENDANT-APPELLANT.

Argued September 24, 1963—Decided October 21, 1963.

*Mr. Paul T. Murphy* argued the cause for defendant-appellant (*Messrs. Crummy, Gibbons & O'Neill,* attorneys).

*Mr. William L. Brach* argued the cause for plaintiffs-respondents.

The opinion of the court was delivered by

JACOBS, J.   The Appellate Division, with one judge dissenting, directed that summary judgment be entered declaring the 1952 extension of the lease between the parties to be void *ab initio* as a gift of public property in violation of *Article* VIII, *sec.* III, *paras.* 2 and 3 of the *New Jersey Constitution.* 79 *N. J. Super.* 363 (1963). In the light of the dissent and the constitutional issue, the East Orange Golf Association appealed to this court as of right. See *N. J. Const. Art.* VI, *sec.* V, *para.* 1.

In 1925 the City of East Orange, by resolution, authorized the execution of a lease of city-owned land to the East Orange Golf Association. The land was part of the East Orange water reserve and consisted of 151 acres located in Millburn Township. The resolution noted that a large group of citizens

of East Orange had formed an association for the purpose of encouraging golf and other athletics and recreational activities among the citizens of the city, and that the City Council desired to encourage such athletic activities on the part of its citizens and felt it to the interest of the city to make the lease with the association. The lease itself referred to the formation of the association and the city's desire to encourage athletic activities on the part of its citizens, and it provided that the rent to be paid by the association would be in the nominal sum of $1.00 *per annum* and that the association would pay Millburn Township any taxes above $1,500 *per annum,* the city agreeing to pay the taxes up to $1,500 *per annum.*

The association expressly agreed in the lease to build a golf course of not less than 9 holes within two years, to extend it to 18 holes as soon as reasonably possible, and to maintain the course "for the sole use of the residents of the City of East Orange and their guests." It also agreed that it would maintain the property during the term of the lease and its extension and that, upon expiration, it would turn over to the city all buildings on the premises, free and clear of all liabilities. The lease provided that if the association defaulted in any of the conditions for a period of 30 days, then it and any renewal would become null and void at the option of the city which would have the right to re-enter. The parties agreed that any violations of the lease would not be cumulative and that a waiver of any violation at any time would not be construed as a waiver of any subsequent violation. The lease was signed on the city's behalf by its then Mayor Charles H. Martens, and by the Board of Water Commissioners of the City of East Orange through its president. See *East Orange v. Board of Water Com'rs. of East Orange,* 40 *N. J.* 334 (1963). It was signed by the East Orange Golf Association through its president, who was then a resident of East Orange, as were all of its incorporators and the members of its board of trustees which included Mayor Martens.

In due course the association, which had been incorporated as an association not for pecuniary profit (*R. S.* 15:1-1 *et*

*seq.*), proceeded with the raising of the necessary funds through the sale of bonds, and the building of the golf course at substantial cost. In 1927 a small additional parcel was added to the leased premises and a second parcel was added in 1936. The original lease was for 10 years, with an option to extend it for 10 years more which the association exercised. In 1935 East Orange submitted a project proposal to the Works Progress Administration for improvement of the golf course premises. The proposal was signed by Mayor Martens and stated that the project was being sponsored by officials of the City of East Orange "for the benefit of the public to enable the average citizen to enjoy the benefits of a public golf course which under ordinary conditions, would be prohibitive due to fees, dues, etc." When the Works Progress Administration disapproved the project, a reconsideration was requested in a communication signed by Mr. Walter C. Ellis who was counsel for the association as well as City Counsel for East Orange.

In his letter to the Comptroller-General at Washington, dated August 13, 1937, Mr. Ellis pointed out that the original undertaking was to construct "a municipal golf course to enable under-privileged men and women of the City to play golf at small expense" and that the city's lease with the association expressly provided that the golf course would be maintained "for the sole use of the residents of the City of East Orange and its guests." Mr. Ellis also noted that the Mayor of East Orange was president of the association's board of trustees, that the balance of the board membership was composed largely of city officials, and that any citizen of East Orange was permitted to play either by registering as a Class A or Class B member and paying an annual fee ranging from $7.50 to $25, plus a daily charge ranging from seventy-five cents to one dollar, or as a nonmember by paying a daily fee ranging from $1.00 to $2.00. Mr. Ellis' letter concluded with the following:

"The plan as outlined above, to provide a municipal golf course for the citizens of East Orange to whom golf was prohibitive because

they were unable to pay membership costs in private golf clubs, was undertaken by a large group of citizens who are willing to give generously of their time for the benefit of the under-privileged. It was desired to accomplish this without expense to other taxpayers of the City who do not play golf. It is obvious that to effect an efficient management of such a plan that it was necessary to organize the group, and this was done under a statute of this State entitled: 'An Act to incorporate associations not for pecuniary profit.' This organization, of course, serves as a temporary agent of the City until all bonds are retired and the completed course with all its appurtenances will be turned over to the Recreation Commission of the City."

Mr. Peer, the current secretary of the association, testified that he recalled the Class A and Class B registration groups of the 1930's but he did not recall any groups which were ever permitted to play simply on the payment of a daily fee. His recollection was that play was at all times confined to members and their guests. He stated that during the depression, the association was in dire need of members and vigorously sought them outside of East Orange as well as within East Orange. As a result the constituency of the association's membership shifted radically. Whereas in 1927 there were 465 members who were residents of East Orange and 92 members who were nonresidents, in 1938 there were only 135 resident members as compared to 251 nonresident members. In 1951 there were only 68 resident members in contrast to 406 nonresident members, and in 1961 there were only 82 resident members compared to 425 nonresident members. In 1959 the association fixed its maximum membership at the figure of 507 and, when in 1962 there were 56 vacancies, they were filled by 7 persons who resided in East Orange and 49 persons who resided elsewhere. Not only is the membership now mostly nonresident but so also is the managing personnel. Thus 4 out of 5 of the association's officers, 4 out of 5 members of its membership committee, and 14 out of its 22 trustees are not residents of East Orange.

The association does not engage in any efforts to solicit East Orange memberships or to acquaint East Orange residents with its facilities. It has no East Orange office or East Orange telephone listing and application forms, though for-

merly available at the East Orange City Hall, are no longer there. Indeed, since 1959, application forms have been obtainable only through a member and applications have been considered only upon sponsorship by a member and endorsement by a second member. In 1957 the City Council of East Orange called the association's attention to the fact that there had been public dissatisfaction with its membership policies. Mr. Peer testified that at that time the members of the board of trustees held the view that they were giving priority to East Orange residents in the consideration of annual applications and were therefore "doing everything that was possible in that regard."

On June 20, 1960 Dr. Campbell filed a complaint with the Division Against Discrimination charging that he had addressed a letter to the association requesting an application for membership but had received no reply, and asserting that he believed he had been refused membership in the association because he was a Negro. On July 31, 1961 Mr. MacArt, Chairman of the East Orange City Council, met with Mr. Stanley Gedney, Jr., attorney for the association, and a committee of its trustees. Mr. MacArt advised that there had been allegations of discrimination "not only against Negro citizens of East Orange but also against white citizens, as well, in their not being able to obtain membership." The representatives of the association stated that they would present the matter to the full board of trustees and that a further meeting would be arranged.

On August 8, 1961 Mr. MacArt requested a list of the association's members in order to help ascertain whether there was a breach of the lease. In response he received a letter dated August 11 from Mr. Gedney which stated that there were 505 members of the club of whom 82 were residents of East Orange and that since the reason for Mr. MacArt's request was to ascertain whether there was a breach of the lease, "the membership information above stated should be sufficient and the names of the individual members would seem immaterial." Mr. Gedney closed his letter with the following:

"It is not denied that the paragraph in the lease obligating the Association to maintain the golf course for the sole use of the residents of the City of East Orange and their guests has been technically breached, practically since the beginning of the term of the original lease. Were this not so, there would have been no golf course, for the use of any of the residents of East Orange. This has been well known at all times to the City officials concerned with the matter. The Association feels that under these circumstances it would be unconscionable for the City now to attempt to cancel the Association's lease on account of this breach, after having permitted the Association in reliance on the lease to invest a very large amount of money over so many years in placing upon the leased land improvements which at the termination of the lease will become the property of the owner of the land. The East Orange Golf Association therefore respectfully declines to furnish the detailed information requested in your letter."

On September 6, 1961 Mr. MacArt wrote to the president of the association's board of trustees requesting that the entire board attend a meeting at the East Orange City Hall on September 15. The reply to this was in a letter dated September 8 from Mr. Gedney declining the invitation to attend the meeting. Mr. Gedney referred to the fact that the association had taken the position before the Division Against Discrimination (now the Division of Civil Rights) that it was a private club and he stated that he was sure that the city officials had been aware for many years that the club had been so operated. On September 12 Mr. MacArt sent telegrams advising that the failure of the trustees of the association to attend the meeting would be taken as evidence that the association was not willing to defend or negotiate its position. Mr. Gedney acknowledged receipt of the telegram, stated that he did not know what charges the association was supposed to defend, and reasserted the position of the association as set forth in his letters of August 11 and September 8. On September 14 a further telegram was sent by Mr. MacArt acknowledging Mr. Gedney's letter and restating that the charges concerned racial discrimination and the inability of East Orange citizens, both Negro and white, to join the association.

On September 15 the scheduled meeting was held but was not attended by any representative of the association. On September 18, James W. Kelly, Jr., Mayor of East Orange, advised the City Council that, in view of all that had transpired, he was recommending that immediate action be taken to cancel the lease between the city and the association. The original lease of 1925 would have expired, after exercise of the option therein by the association, in 1945; it was first extended to 1955 and then to 1960 with an option in the association to continue it to 1965. That option was exercised by the association which now claims the right to remain in the premises until March 26, 1965. See 79 *N. J. Super.*, at *pp.* 368–369. It may be noted here that the extensions expressly provided that they were subject to all of the conditions set forth in the lease of 1925.

On October 27, 1961 the city filed a complaint in the Superior Court seeking to have the lease declared void *ab initio* or to have it terminated because of a breach of the conditions in the lease. In one of its counts, the city alleged that the consideration paid for the lease was merely nominal and that the lease therefore constituted an unconstitutional gift of public property. 79 *N. J. Super.*, at *pp.* 369–375; *cf. Rockaway Borough v. Rockden American Legion,* 39 *N. J.* 504 (1963); *Spoerl v. Pennsauken Tp.,* 14 *N. J.* 186 (1954). In another count it alleged that the association was operating its golf course on a discriminatory basis involving the exclusion of certain ethnic and racial groups, particularly Negroes, and that under the particular circumstances presented here such operation on leased public land was violative of constitutional principles. See *Hampton v. City of Jacksonville, Florida,* 304 *F. 2d* 320 (5 *Cir.* 1962), *cert.* denied 371 *U. S.* 911, 9 *L. Ed. 2d* 170 (1962); *Burton v. Wilmington Parking Authority,* 365 *U. S.* 715, 81 *S. Ct.* 856, 6 *L. Ed. 2d* 45 (1961). However, in its first and primary count, the city alleged that assuming its execution of the lease to have been entirely valid, the lease was nonetheless materially breached by the association's failure and refusal to maintain the golf course for the

sole use of the residents of East Orange and their guests as its terms expressly required. It urges that the conditions of the lease having been violated and a right of re-entry having been expressly provided for in the lease, it is now entitled to have the lease terminated and the association ousted from the premises. See *Essex Title Guaranty & Trust Co. v. Wylie*, 120 *N. J. L.* 217 (*E. & A.* 1938); *West Shore R. Co. v. Wenner*, 75 *N. J. L.* 494 (*E. & A.* 1907); *Ocean Grove Camp Meeting Ass'n. v. Sanders*, 68 *N. J. L.* 631 (*E. & A.* 1902).

After the filing of answers, interrogatories were submitted and depositions were taken. In October 1962 the city served notice with supporting affidavits that it would move for summary judgment. Briefs were submitted and after argument the motion was denied by a county judge sitting in the Law Division of the Superior Court. He first referred to the line of cases holding that summary judgment is not the proper course where there are material factual disputes. See *Judson v. Peoples Bank & Trust Co.*, 17 *N. J.* 67 (1954); *United Advertising Corp. v. Metuchen*, 35 *N. J.* 193 (1961). He then expressed the view that there were material factual disputes bearing on all three of the city's claims and that the case should therefore proceed to plenary trial. In the Appellate Division, there was a division of opinion but a majority found that there were no material factual disputes bearing on the city's claim that the lease amounted to an unconstitutional gift of public property and was therefore void *ab initio*. We find no occasion to discuss the claim passed upon by the Appellate Division since we are entirely satisfied from the record before us that the city must prevail on its claim that there was a breach of the condition in the lease now entitling it to a judgment of termination and ouster.

The breach of the condition in the lease and its continuance to date are beyond dispute. The association undertook unequivocally to maintain the golf course "for the sole use of the residents of East Orange and their guests." It has not done so in the past and is not doing so now. The association refers to the lease as being "technically violated" although it would

appear entirely evident that the violation is of real substance rather than mere form. The purpose of the arrangement was to make an athletic and recreational facility available to East Orange citizens—not just some chosen few of them but all of them. The very phraseology of the lease evidenced the public nature of the arrangement and the fixing of the annual rent at the nominal sum of $1.00 displayed the undoubted understanding that the vital consideration to the city was the public benefit to its citizens as a whole. See *Runnemede v. New Jersey Water Co.,* 123 *N. J. L.* 383, 387 (*E. & A.* 1939); *Morris and Essex R. Co. v. Newark,* 76 *N. J. L.* 555, 560 (*E. & A.* 1908).

The association stresses that during the days of the depression it had to seek members and players wherever it could find them although its own counsel's letter in 1937 discloses how, even in those days, the course could fairly be operated for the benefit of all East Orange residents. See *Edwards v. Leopoldi,* 20 *N. J. Super.* 43, 49 (*App. Div.* 1952), certif. denied 10 *N. J.* 347 (1952); *Adams v. Jersey Central Power & Light Co.,* 36 *N. J. Super.* 53, 69 (*Law Div.* 1955), aff'd, 21 *N. J.* 8 (1956). After the depression, the association did nothing towards the discharge of its obligations to the citizens of East Orange. Instead of opening its course indiscriminately to East Orange residents and taking steps towards attracting their play, it took steps which had the contrary purpose and effect. It withdrew its application forms from the City Hall and tightened its requirements so that applications could be submitted only upon sponsorship by a member and endorsement by a second member. The fact is that the association has been and is, even now, operating as a private club, subject only to its current assertion that, if perchance an East Orange resident is able to obtain sponsorship and endorsement by club members, his application will receive prior consideration in the filling of any vacancy in its limited membership roll. This approach ignores the fact that the association has no legal right to operate as a private golf club or to exercise the selective practices which are the hallmark

of such clubs, since the land which it is holding at a nominal rental is public land and the lease under which it is operating subjects it to a public undertaking.

The lease contains a provision that if the association defaults in any of its conditions for a period of 30 days then the lease may be declared void and the premises may be re-entered. Although the Board of Water Commissioners joined the city in the execution of the lease and is named as a party defendant to this action, its position here is only a nominal one; insofar as this proceeding is concerned the city may be viewed as the sole lessor. See *East Orange v. Board of Water Com'rs. of East Orange, supra*, 40 *N. J.* 334. In the light of the undisputed breach by the association and the clear terms of the lease, the city has the legal right to a declaration of termination and ouster, absent some special defense on the part of the association. See *Essex Title & Guaranty Trust Co. v. Wylie, supra; West Shore R. Co. v. Wenner, supra; Ocean Grove Camp Meeting Ass'n. v. Sanders, supra.* In its brief and oral argument before us the association advanced, as a special defense, the contention that the city had waived the lease provision requiring that the golf course be maintained for the sole benefit of the residents of East Orange and is now estopped from asserting it, citing *Vogt v. Borough of Belmar*, 14 *N. J.* 195 (1954); *Summer Cottagers' Ass'n of Cape May v. City of Cape May*, 19 *N. J.* 493 (1955); 1 *American Law of Property* § 4.9, *p.* 424 (1952).

Although the term "waiver" is given varying definitions in varying contexts, it is generally taken to be the intentional relinquishment of a known right. See *West Jersey Title & Guaranty Co. v. Industrial Trust Co.*, 27 *N. J.* 144, 152 (1958); *Merchants Indem. Corp. v. Eggleston*, 37 *N. J.* 114, 128 (1962); 3A *Corbin, Contracts* § 752 (1960); 5 *Williston, Contracts* §§ 678, 679 (*3d ed.* 1961). Assuming, though solely for present purposes, that earlier breaches of the conditions in the lease may be deemed to have been waived (but *cf. Spoerl v. Pennsauken Tp., supra*, 14 *N. J.* 186, 194), there clearly was no waiver of the recent and current breaches

by the association. The lease itself expressly provided that the waiver of a violation shall not be construed as a waiver of a subsequent violation. This would be true here, even apart from the provision, since the association's undertaking to maintain the golf course for the sole use of the residents of East Orange was a continuing one. In *Plassmeyer v. Brenta*, 24 *N. J. Super.* 322 (*App. Div.* 1953), the court noted that, if a covenant represents a continuing obligation, conduct such as the acceptance of rent with knowledge of a particular breach may legally effect the release of that breach but not the release of a future breach (24 *N. J. Super.*, at *p.* 330); this approach is accepted generally throughout the country. See *London v. Tebo*, 246 *Mass.* 360, 141 *N. E.* 234 (1923); *Extension Oil Co. v. Richfield Oil Corporation*, 52 *Cal. App.* 2d 105, 125 *P. 2d* 895 (1942); 1 *American Law of Property, supra*, § 3.95, *p.* 384; 32 *Am. Jur., Landlord and Tenant* § 890, *p.* 754 (1941); *cf. North v. Jersey Knitting Mills*, 98 *N. J. L.* 157 (*E. & A.* 1922).

The *Summer Cottagers'* and *Vogt* cases, upon which the association relies, dealt with the doctrine of equitable estoppel rather than waiver, and the association places its main reliance on the suggested applicability of that doctrine. In *Vogt* the Borough of Belmar adopted an ordinance which provided for a volunteer fire department. The ordinance made provision for active firemen over the age of 21 but contained no reference whatever to junior firemen under that age. However, the services of junior firemen were availed of for many years and when one of them was injured he filed a claim for compensation which was resisted by the borough. In holding that the borough was estopped, the court noted that it would be contrary "to the plainest principles of justice" to permit the borough to defeat the claim for compensation. In the course of his opinion, Justice Heher pointed out that, while not applied as freely against the public as against private individuals, the doctrine of estoppel may be invoked against a municipality to prevent manifest wrong and injus-

tice. 14 *N. J.*, at *p.* 205. But *cf. Clifton v. Cresthaven Cemetery Assn., Inc.,* 136 *N. J. Eq.* 56, 57 (*Ch.* 1944).

In the *Summer Cottagers'* case, the city sold land without complying with the statutory procedures relating to public notice and free competitive bidding. After a motel being constructed on the land was practically completed, some citizens sought to void the sale of the land. The court invoked the principle of estoppel to bar the attack but in the course of its opinion had this to say:

> "The principle of estoppel *in pais* is not, for obvious reasons, given the same freedom of application against the public as against private persons. Municipalities, for example, are agencies of government for local administration with enumerated powers, and deviations from the legislative grant must needs have the legal consequences comporting with the declared legislative intention and policy. The essential principle of the policy of estoppel here invoked is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct." 19 *N. J.*, at *pp.* 503–504

In *Tremarco Corporation v. Garzio,* 32 *N. J.* 448 (1960), *Gruber v. Mayor & Tp. Com. of Raritan Tp.,* 39 *N. J.* 1 (1962), and *405 Monroe Co. v. Asbury Park,* 40 *N. J.* 457 (1963), this court recently reiterated its position that equitable principles of estoppel may be applied against public bodies where the interests of "justice, morality and common fairness" dictate that course. However, in all of these cases, as in *Summer Cottagers'* and *Vogt,* the actions of the public bodies were within their general powers and the equities favoring the private parties were strong and clear. In none of them was the situation at all comparable to the case at hand for in none of them was there an effort to avoid enforcement of an express contractual undertaking for the public benefit. Here we are satisfied that the acknowledged facts, even when viewed most favorably from the association's viewpoint, preclude any estoppel against the city.

The very purpose of the city's leasing arrangement was to make an athletic and recreational facility available to its citi-

zens. That purpose was known to the association and was implemented by an unequivocal condition in the lease. The association knew that it was not dealing with a private lessor but with a public body acting under public obligation to the residents of East Orange. It knew that in accepting the public land under the terms of the lease and at a nominal rental it likewise came under public obligation to those residents. Notwithstanding all this and in flagrant disregard of its lease undertaking, it has been and is conducting itself as a private golf club. Whatever argument of alleged necessity might have been advanced during the depression is no longer pertinent, for that time has long since passed. In the last two decades the association could readily have taken effective steps towards the discharge of its public obligation. It took no such steps and, indeed, failed to take corrective action even after it became aware during recent years of vigorous complaints by individual residents and city officials.

The association stresses that it has expended large sums of money for capital improvements. Those sums were expended some time ago with full knowledge of the public undertaking in the lease. The association, while operating as a private golf club, has received their benefits in substantial measure. Giving due weight to the expenditures and all other factors, we fail to see how an estoppel in favor of the association could at all be justified. If estoppel were invoked here it would be to perpetuate a wrong and injustice rather than to prevent it. Our view of the undisputed circumstances satisfies us that the pertinent equitable considerations heavily favor the city rather than the association, and that suitable protection of the public interest calls for an immediate declaration of forfeiture and ouster as sought by the city.

Affirmed.

*For affirmance* — Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—None.