OPINION OF THE COURT
Meyer, J.
This appeal concerns the effect of guidelines or rules published by a private educational institution upon its right to suspend a student. We hold that such an institution is bound by its own rules and, therefore, reverse the order of the Appellate Division and remit the matter to the Supreme Court, Richmond County, for entry of a judgment in accordance with this opinion.
Plaintiff Nancy Jean Tedeschi was admitted to Wagner College, a private institution, in September, 1976. She was a part-time student taking courses in mathematics, Latin and psychology. Her performance during the fall semester presented both academic and social problems, however. Dr. Thompson, her Latin professor, testified that she did not participate in class, did not know the required material and only once of the several times called upon was able to answer correctly even a simple question about Latin grammar. Her conduct during class was also disruptive in that three or four *656 times during each period she would pick up her handbag and leave the room, returning after two to five minutes.
On the evening of December 20, 1976 Ms. Tedeschi sat for her Latin examination, but at the end of it dramatically tore up her blue book and did not hand it in. In response to her question, Dr. Thompson advised her that without an examination score her grade for the course would be an F. Beginning at 4 a.m. the next morning and continuing until late in the evening of December 22, Dr. Thompson was subjected to a barrage of telephone calls in which Ms. Tedeschi repeatedly threatened to commit suicide, or to "fix” Dr. Thompson, and at one point appeared in a distraught condition at the front door of his home. Only when the police were summoned and advised plaintiff of the possible criminal consequences did the calls cease.
On January 10, 1977 through his secretary, Dr. Wendel, the academic dean, contacted plaintiff and her mother by telephone to arrange a meeting with them for the purpose of discussing plaintiff’s academic situation, in view of her incomplete grades in two courses. Plaintiff, however, refused to meet stating that there was no problem. There followed, nevertheless, another series of harassing calls by plaintiff to Dr. Thompson. Later that evening in a telephone conversation between Dr. Thompson and Nancy’s mother, Mrs. Tedeschi refused to discuss the matter with college officials and insisted that any problem should be presented to her in a formal letter from the college. The next day plaintiff was orally advised by Dr. Wendel that she was suspended by the college because of her bad character and the repeated disruption of her Latin class. Thereafter she met with the academic dean, the dean of students and an assistant to the president, who testified that during the interviews plaintiff’s conduct was irrational and discussion fruitless. By letter dated January 13, 1977 plaintiff was advised by the dean of students, Dr. Guttu, that after consultation with Dr. Wendel and other members of the faculty and the administration, she was "withdrawn from classes for the 1977 spring semester” but could, if she wished, reapply in the fall. Shortly thereafter plaintiff’s tuition for the spring semester was refunded. Plaintiff’s mother testified that she called the school several times to arrange a hearing, but without success.
Plaintiff then began this action alleging that she had not been granted a hearing or afforded an opportunity to defend *657 herself and that she had been arbitrarily frustrated in completing her education. She asked for an order reinstating her and for damages. The trial court found that there was no constitutional violation since Wagner College was not State involved, that it could not review the decision to suspend plaintiff on the basis of her academic record, that the disciplinary aspects of her suspension were not arbitrary, that the college was obligated only to act in good faith, that the informal procedure followed was believed to be in plaintiffs best interests and that she had failed to prove any damage. On appeal from the judgment for defendant entered on that decision, the Appellate Division affirmed by a divided court. The majority took note of the college guideline quoted below but held that plaintiff had rebuffed several attempts by the college to arrange a conference; the dissenters reasoned that the relationship between a college and its students is contractual and that the college was bound to follow its own rules relating to suspension. Though we do not arrive at our conclusion on exactly the same reasoning, we agree with the dissenters below that the college has not conformed to the procedure its guidelines prescribed and that plaintiff is entitled to have it do so. We, therefore, reverse.
The guideline referred to is part of a publication distributed by the office of the dean of students entitled 1976-1977 Guidelines of Wagner College. The portion pertinent to this appeal reads:
"Whenever it shall appear that any student is not making satisfactory progress in his studies, and that his scholastic standing does not meet the requirements specified by the Committee on Academic Standards he shall be discharged from the College. If for any other cause a student is deemed to be an unfit member of the College, the Dean of Students may notify parents or guardians in order that they may have an opportunity to withdraw the student.
"A student may be suspended or expelled from the College by the Dean of Students or the Dean of Academic Affairs. If he is suspended or expelled for any cause other than failure in his academic work, and has not had recourse to a hearing before an established College Court, he shall have the right to be heard by the Student-Faculty Hearing Board which shall present its findings to the President of the College for final determination. ’ ’
The differentiation between suspension or expulsion for aca *658 demic unfitness and suspension or expulsion for causes other than academic failure drawn in that guideline reflects the dichotomy in decisional law drawn along similar lines.
As is recognized by our recent decision in Matter of Olsson v Board of Higher Educ. (49 NY2d 408) and the cases cited therein, because matters involving academic standards generally rest upon the subjective judgment of professional educators, courts are reluctant to impose the strictures of traditional legal rules. Though such matters are subject to judicial scrutiny, the issue reviewed in such a case is whether the institution has acted in good faith or its action was arbitrary or irrational.
Suspension or expulsion for causes unrelated to academic achievement, however, involve determinations quite closely akin to the day-to-day work of the judiciary. Recognizing the present day importance of higher education to many, if not most, employment opportunities, the courts have, therefore, looked more closely at the actions of educational institutions in such matters.
The legal theory upon which review should be predicated in such cases is, however, not entirely clear. Plaintiff argues, and the dissenters in the Appellate Division agree, that the student-private college relationship is contractual and that it is an implied term of the contract that rules such as the Wagner College Guidelines will be adhered to by the college. There is support for that concept in decisional law (Matter of Carr v St. John’s Univ., N. Y., 17 AD2d 632, affd 12 NY2d 802; People ex rel. Cecil v Bellevue Hosp. Med. Coll., 60 Hun 107, affd 128 NY 621; Goldstein v New York Univ., 76 App Div 80; Drucker v New York Univ., 59 Misc 2d 789) and in legal commentary as well (Beach, Fundamental Fairness in Search of a Legal Rationale in Private College Expulsions, 2 J Coll & Univ L 65, at pp 65-70, 79-81; Center for Law & Education, The Constitutional Rights of Students: Analysis and Litigation Materials For The Student’s Lawyer, pp 371-372 [hereafter "Student’s Lawyer”]; Note: 48 Ind LJ 253; Note: 37 Ohio State LJ 608; Note: 72 Yale LJ 1362).
Contract theory is not wholly satisfactory, however, because the essentially fictional nature of the contract results in its generally being assumed rather than proved, because of the difficulty of its application, and because it forecloses inquiry into, and a balancing of, the countervailing interests of the student on the one hand and the institution on the other (see *659 Matter of Ryan v Hofstra Univ., 67 Misc 2d 651, 659; "Student’s Lawyer”, at p 372; Abrams & Hofman, Common Law Rights for Private University Students: Beyond the State Action Principle, 84 Yale LJ 120, 122, 143-144 [hereafter "Common Law Rights”]; Rabban, Judicial Review of the University-Student Relationship: Expulsion and Governance, 26 Stan L Rev 95, 97, 104-106 [hereafter "Judicial Review”]). An added problem is that when urged in academic achievement as distinct from nonacademic matters the contract tends to be limited to the implied in law condition of good faith, i.e., not to act arbitrarily (cf. Matter of Olsson v Board of Higher Educ., supra) to the ultimate confusion of the rules applicable in the two situations.
An alternate basis for review of nonacademic disputes between students and private colleges, the application of the principles of the law of associations, is supported by case law in some other States (Baltimore Univ. v Colton, 98 Md 623; Abbariao v Hamline Univ. School of Law, — Minn —, 258 NW2d 108, 112; Commonwealth ex rel. Hill v McCauley, 3 Pa County Ct 77; see Student Bar Assn. v Byrd, 293 NC 594; Blatt v University of So. Cal., 5 Cal App 3d 935) as well as by legal commentators (Chafee, Internal Affairs of Associations Not for Profit, 43 Harv L Rev 993, 996, 1013-1014, 1026, 1028-1029; Developments in the Law — Judicial Control of Actions of Private Associations, 76 Harv L Rev 983, 989, 1011, 1014, 1032 [hereafter "Developments”]; "Student’s Lawyer”, at pp 373-374; "Common Law Rights”, at pp 140-150; "Judicial Review”, at pp 112-117, 119-129).
The law of associations accords judicial relief to an association member suspended or expelled without adherence to its rules (Chafee, op. cit., at pp 1014, 1018-1020; "Developments”, at pp 995, 1021; 14 CJS 1288-1289, Clubs, § 17; 6 Am Jur 2d 465-468, Associations & Clubs, §§ 36, 37). The courts of this State have consistently recognized the right to such relief (Browne v Hibbets, 290 NY 459; Polin v Kaplan, 257 NY 277; Simons v Berry, 240 NY 463; People ex rel. Deverell v Musical Mut. Protective Union, 118 NY 101; People ex rel. Meads v McDonough, 8 App Div 591; Loubat v Le Roy, 40 Hun 546).
The parallel between associations and universities is, of course, not exact since students do not participate in the governance of a university with the same voice as generally do members in the functioning of an association (cf. "Common Law Rights”, at pp 144-145). The situation is further confused *660 by the facts that at least in part the association law under discussion is stated in terms of contract (Browne v Hibbets, supra, at p 466; Polin v Kaplan, supra, at p 282), and that in several cases the obligation to follow its own rules has been applied to a private university without reference to contract law (Matter of Kwiatkowski v Ithaca Coll., 82 Misc 2d 43, 48; Matter of Ryan v Hofstra Univ., 67 Misc 2d 651, 660-661, supra; see Matter of Olsson v Board of Higher Educ., 66 AD2d 196, 198, revd on other grounds 49 NY2d 408, supra; Matter of Sofair v State Univ. of N. Y. Upstate Med. Center Coll. of Medicine, 54 AD2d 287, 292, revd on other grounds 44 NY2d 475).
We do not find it necessary in the present case to resolve such problems as may arise out of the different theoretical predicates. Whether by analogy to the law of associations, on the basis of a supposed contract between university and student, or simply as a matter of essential fairness in the somewhat one-sided relationship between the institution and the individual, we hold that when a university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion that procedure must be substantially observed.
We are brought then to a consideration of the guideline in question in relation to the suspension of Nancy Tedeschi. Had her suspension been solely for unsatisfactory progress in her studies, the guideline would have imposed no further obligation on the college and the only judicially re viewable question would have been whether it had acted in good faith (Matter of Olsson v Board of Higher Educ., supra). Moreover, there was substantial compliance with so much of the guideline as required that Nancy’s parent be notified that Nancy was considered unfit for a cause other than academic, since Dr. Wendel sought to arrange a meeting between Mrs. Tedeschi and college officials to discuss Nancy’s problems.
The guideline permits either the dean of students or the dean of academic affairs to expel or suspend a student. The withdrawal letter forwarded on January 13, 1977 by the dean of students was, therefore, in conformance with its provisions. But the guideline does not stop there. It requires a further hearing by the Student-Faculty Hearing Board and review of that board’s findings by the president of the college in any case in which suspension is for a cause other than academic *661 failure and the student has not had a hearing before an established college court.
Dr. Guttu testified that the college court normally dealt with civil disorders or complaints by one student against another, but that cannot avail the college for it is undisputed that no court or board of any kind ever considered Nancy’s case. As to the cause for Nancy’s suspension, the Appellate Division found that it was based on her irrational and disruptive conduct. It, thus, apparently tacitly overruled the Trial Judge’s reference to academic standing as a cause, but even if it did not, the further proceedings required by the guideline would still be mandated. This is because a suspension for both academic and other causes is necessarily, at least in part, a suspension for a cause other than academic failure. That is not to say that the board would have the right, not given it by the guideline, to review Nancy’s scholastic standing as a ground for suspension, but simply to require that she have what the guideline accords her: review of the cause other than academic failure that it involved.
The college argues that Nancy’s informal meetings with the two deans and the president’s assistant was sufficient compliance with the guideline. Though those meetings may have been sensitive and fair, as the Trial Judge indicated, it constituted no acceptable substitute for a hearing board composed of both students and faculty. The college also suggests that the refusal of Mrs. Tedeschi to meet with its officials constituted a waiver of Nancy’s hearing rights, but the guideline itself refutes that, since the purpose of such a meeting is simply to give the parent the possibility of avoiding embarrassment by withdrawing the student. Nor can we accept the suggestion that plaintiff was obliged to make a formal demand for a hearing before the Student-Faculty Hearing Board. Not only is the guideline phrased in mandatory terms ("shall have the right to be heard”) but also it was the obligation of the college in effecting the suspension to call plaintiff’s attention to the further procedures provided for by the guidelines (Loubat v Le Roy, 40 Hun 546, 552, 556, supra). Even were that not so, plaintiff’s complaint which specifically noted that she had never had a hearing would constitute a sufficient demand (see Fried v Straussman, 41 NY2d 376, 380).
Under the guideline plaintiff was properly suspended but was entitled to review of her suspension by the hearing board and the president. So much of the complaint as sought money *662 damages and the right to a due process hearing based on claimed "state action” was properly dismissed, but she was entitled to judgment directing review by that body and that official as the guidelines require.
A few words with respect to the dissent are in order. What the guideline contemplates, and what this opinion holds that it requires (supra, pp 660-662) is review, by the Student-Faculty Hearing Board and by the president, of the nonacademic cause for Ms. Tedeschi’s suspension. The apparent purpose of that review is the different viewpoint that may be taken by a hearing board composed of faculty and students than will be taken by a dean, whether the dean of students or the dean of admissions.* No reason, other than the possible burden on the college in holding such a hearing, is suggested by the dissent for denying her that right.
The crux of the dissent is contained in its references (p 666) to elevating "formal legalistic principles over the dictates of ordinary common sense” and to "a mechanistic approach to the law”. As Mr. Justice Felix Frankfurter wrote almost 40 years ago in McNabb v United States (318 US 332, 347), "The history of liberty has largely been the history of observance of procedural safeguards.” If that be true in the dealings of the State with citizens enmeshed with its criminal justice system it is no less true in the dealings of a college with the members of its student body. To suggest, as does the dissent, that the college can avoid its own rules whenever its administrative officials in their wisdom see fit to offer what they consider as a suitable substitute is to reduce the guidelines to a meaningless mouthing of words. We do not countenance that in other relationships nor should we between student and college.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted to Supreme Court, Richmond County, with directions to enter judgment reinstating plaintiff as a student for the September, 1980 term of the college, unless prior to the opening of that term she has been accorded a hearing by the Student-Faculty Hearing Board.

 "[E]ven if the facts are undisputed and the determinative issue is whether the student’s actions warrant his expulsion under existing policy or rules, the student should have some opportunity to justify his behavior so that the decision making tribunal has available the arguments of both sides and can form a balanced judgment” (Developments In The Law — Academic Freedom, 81 Harv L Rev 1045, 1138-1139).