Robert CLAYTON, Plaintiff,

v.

The TRUSTEES OF PRINCETON UNI-
VERSITY, a corporation of the State
of New Jersey, Defendant.

Civ. No. 80–1611.

United States District Court,
D. New Jersey.

Aug. 6, 1981.

Morton Stavis, Hoboken, N. J., for plaintiff (Neil Mullen, on the brief).

Smith, Stratton, Wise & Heher, Princeton, N. J. by William J. Brennan III, Princeton, N. J., for defendant (Alexander P. Waugh Jr., Princeton, N. J., on the brief).

## OPINION

HAROLD A. ACKERMAN, District Judge.

■ Amphioxus is a genus of small creatures possessing a fairly simple set of organs. The genus is distinguished, among other things, by the presence of a notochord, which may be described as a primitive spinal column. Evolutionists sometimes give the amphioxus credit for being the first creatures to possess a notochord, a feature that they believe eventually led to the evolution of the human spinal column. Whether the evolutionists are right or wrong, it is clear that the case before me today evolved from one poor amphioxus that had been cut up so that its notochord could be displayed to a group of Princeton University undergraduates. The students were taking a type of test known as a lab practical which required them to identify various specimens or parts thereof as they moved from station to station in a biology lab. Robert Clayton, who is the plaintiff in this case, was accused by a fellow student of changing an answer on his test so that the notochord would be correctly identified. A disciplinary body known as the Princeton Honor Committee convicted him on this charge and suspended him from Princeton for one year. This decision was affirmed by the President of Princeton University, William G. Bowen. Although Mr. Clayton has now returned to Princeton to complete his undergraduate studies, he has brought this suit challenging both the procedures and the sufficiency of the evidence relied upon by Princeton in reaching its decision to suspend him. This Court has both diversity and federal question jurisdiction over the case. The case is before me today on cross-motions for summary judgment.

■ The parties have each filed extensive briefs and documentation with the Court in support of their respective motions. I have read their papers and many of the authorities cited carefully and it is clear to me that the question of what role a Court should play in student disciplinary matters is a matter in dispute not only between the parties but among the various courts and legal scholars that have considered the question. The plaintiff has set forth both common law and constitutional claims in his complaint. Insofar as common law claims are made the parties are in agreement that New Jersey law applies. In accordance with well-established jurisprudential principles I must, of course, consider any common law claims before addressing whatever constitutional issues may be present. *Siler v. Louisville & Nashville Railroad Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909). The principal difficulty with this approach is that neither the parties' nor my own research has turned up a New Jersey decision dealing with the standards to be applied in considering disciplinary actions taken by a university. I must, therefore, predict as best I can what

standards would be applied to this case by a New Jersey court. *Becker v. Interstate Properties*, 569 F.2d 1203, 1204–06 (3d Cir. 1977).

Mr. Clayton's first line of attack on the validity of his suspension is that Princeton did not follow its own rules in reaching its decision to suspend him. In support of this argument he relies upon the 1980 decision of the New York Court of Appeals, that state's highest court, in *Tedeschi v. Wagner College*, 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (Ct.App.1980). In that opinion Judge Meyer wrote:

> We do not find it necessary in the present case to resolve such problems as may arise out of the different theoretical predicates. Whether by analogy to the law of associations, on the basis of a supposed contract between university and student, or simply as a matter of essential fairness in the somewhat one-sided relationship between the institution and the individual, we hold that when a university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion that procedure must be substantially observed.

427 N.Y.S.2d at 659, 404 N.E.2d 1302. Princeton argues that a less rigorous standard should be applied and that the court should only determine whether Mr. Clayton was accorded basic procedural fairness. In applying this standard, Princeton argues that the court should not be unduly concerned with whether the University followed its written procedures as long as the procedures actually followed provided basic procedural fairness. In support of this standard Princeton relies upon such cases as *Sill v. Pennsylvania State University*, 462 F.2d 463 (3d Cir. 1972); *Wisch v. Sanford School, Inc.*, 420 F.Supp. 1310 (D.Del.1976); and *Edwards v. Board of Regents of Northwest Missouri State University*, 397 F.Supp. 822 (W.D.Mo.1975). It should be noted that the *Sill* case, which is a Third Circuit opinion, only discussed constitutional questions in a challenge to disciplinary procedures followed by a state university. It is not, therefore, binding upon this court's consideration of the common law relationship between a student and a private university.

In choosing between the two approaches proffered by the parties I have been greatly influenced by New Jersey's law of associations. It is in that area that the New Jersey courts have confronted situations where contract rights, property rights, and rights of personal freedom merge into a relationship similar to the one between a student and a university. For example, in *Higgins v. American Society of Clinical Pathologists*, 51 N.J. 191, 238 A.2d 665 (1968), the New Jersey Supreme Court considered the situation of a professionally qualified medical technologist whose certification by the defendant society had been revoked after she had violated an ethical standard promulgated by the society. In discussing the nature of her loss, Justice Proctor wrote for a unanimous court:

> The rights accorded to members of an association traditionally have been analyzed either in terms of property interests—that is, some interest in the assets of the organization, or in terms of contract rights—that is, reciprocal rights and duties laid down in the constitution and bylaws. These theories, however, are incomplete since they often prevent the courts from considering the genuine reasons for and against relief, and have been extensively criticized. Leading commentators have pointed out that the real reason for judicial relief against wrongful expulsion is the protection of the member's valuable personal relationship to the association and the status conferred by that relationship. As Professor Chafee has noted, "the wrong is a tort, not a breach of contract, and the tort consists in the destruction of the relation rather than in a remote and conjectural right to receive property." The loss of *status* resulting from the destruction of one's relationship to a professional organization ofttimes may be more harmful than a loss of property or contractual rights and properly may be the subject of judicial protection. This State's highest court has recognized that personal rights, as distinguished from property or contractual

rights, are a proper subject for judicial protection. In *Vanderbilt v. Mitchell*, 72 N.J.Eq. 910 [67 A. 97] (E. & A. 1907), the court held that the technical violation of complainant's property rights warranted judicial relief, but went on to say:

> "If it appeared in this case that only the complainant's status and personal rights were thus threatened or thus invaded * * * we should hold, and without hesitation, that an individual has rights, other than property rights, which he can enforce in a court of equity and which a court of equity will enforce against invasion, and we should declare that the claimant was entitled to relief * * *."

*Id.*, at p. 919 [67 A. 97]

Though it may be conceded that the plaintiff in the present case has suffered neither tangible economic loss nor any loss remediable under the traditional contract and property theories, we believe that her membership represented an interest of sufficient value to warrant judicial protection if it has been subjected to an unjust interference. Certification of the plaintiff by ASCP conferred upon her the standing of a competent professional. Her membership in this professional society gave her recognition and status, two important elements of professional success. According to the defendant's pamphlet, quoted earlier in this opinion, the Registry "has elevated the status of the medical laboratory worker to a high professional level." From the record it is clear that the designation M.T. (ASCP) is the hallmark of competence in the field of medical technology. Plaintiff's status as a certificate holder imparts a certain cachet which distinguishes her from those non-certified laboratory workers who presumably are not as well trained or well qualified as is the plaintiff. Certification by ASCP and listing in its Registry is the concrete and authoritative recognition of high professional attainment in the field. Because the Registry has come to be recognized by the leading medical and hospital groups as the only authoritative qualifying body for medical technologists, the certificate gives to its holder a valuable distinction. It is beyond doubt that plaintiff's standing in her profession has been impaired by the loss of this distinction. We conclude that the plaintiff's stake in her professional status is substantial enough to warrant at least limited judicial examination of the reason for her expulsion.

*Higgins*, 51 N.J. at 199–202, 238 A.2d 665 (citations omitted). This analysis seems equally applicable to Mr. Clayton's case. The defendant would hardly deny that there is a certain cachet to an undergraduate degree from Princeton University. Nor can it reasonably be denied that the value of the degree is impaired by the presence of a notation of disciplinary suspension on the academic transcript. It is undisputed that Princeton's action in suspending Mr. Clayton has had a significant impact upon his status as an honorable member of the academic community. Indeed, Princeton would not have it any other way. Princeton justifiably views cheating as a serious offense against the standards of its academic community which is worthy of serious punishment. It is clear to me, therefore, that the New Jersey courts, following *Higgins*, would provide some measure of protection to Mr. Clayton's status as a member in good standing of Princeton's academic community.

To state that the New Jersey courts would provide some measure of protection to Mr. Clayton does not, however, answer the question of what standards would be applied in reviewing a student disciplinary matter. *Higgins*, which concerned itself with whether the ethical standard in question was void as against public policy, addressed a related issue only in dictum stating that an association and its members are generally bound by the private law of the association. 51 N.J. at 22, 238 A.2d 665. When the New Jersey courts have directly addressed the question of whether an association must observe its own rules in disciplining a member the answer has always been yes. A good example of this is *Baugh v. Thomas*, 56 N.J. 203, 265 A.2d 675 (1970).

In that case the plaintiffs alleged that they had been expelled from their church in violation of established procedures for expulsion of members. The New Jersey Supreme Court unanimously reversed the conclusion of the lower courts that there was no jurisdiction to review such a claim. The court held that when neither spiritual nor doctrinal matters were involved in the case a court should hold a church to its own rules. In this regard, the court stated that a church should be treated like any other voluntary association. 56 N.J. at 208–209, 265 A.2d 675. In other contexts as well the New Jersey courts have insisted upon adherence to an organization's own rules. *See, e. g., Walsh v. International Alliance of Theatrical Stage Employees*, 136 N.J.Eq. 115, 40 A.2d 623 (E. & A. 1944) *affirming* 22 N.J.Misc. 161, 37 A.2d 667 (Chancery 1944) (trade union); *Calabrese v. Policemen's Benevolent Association, Local No. 76*, 157 N.J.Super. 139, 384 A.2d 225 (L.Div.1978) (trade union); *Leeds v. Harrison*, 7 N.J.Super. 558, 72 A.2d 371 (Chancery 1950) (Y.W.C.A.); *Height v. Democratic Women's Luncheon Club of New Jersey, Inc.*, 131 N.J.Eq. 450, 25 A.2d 899 (Chancery 1942) (political organization). I do not believe that the New Jersey courts would extend greater deference to a University than they have extended to churches, unions, Y's, and political organizations. Certainly the proposition that once an organization has established rules for itself it must follow them is not a radical proposition. Princeton voluntarily promulgated the procedures that Mr. Clayton claims it violated in suspending him. It is not unreasonable to hold Princeton to the requirement of substantial compliance with those procedures. I have concluded, therefore, that the New Jersey courts would approach this case in a manner similar to that taken in *Tedeschi, supra*. If Mr. Clayton can demonstrate that Princeton materially breached its procedures in deciding to suspend him then he will be entitled to some form of relief from this court.

■ It remains to be seen whether either party is entitled to summary judgment when this principle is applied to the record before me. In answering that question I have given each party, in turn, the benefit of every factual inference that can reasonably be drawn from the record in opposition to the motion as required by *Janek v. Celebrezze*, 336 F.2d 828 (3d Cir. 1964), and many other cases. When these standards are applied to the record neither party can be granted the relief sought today.

■ Two examples of material facts in dispute will suffice. As mentioned earlier in this opinion, Mr. Clayton's suspension was ordered by a body known as the Princeton Honor Committee and affirmed by the University president. The Honor Committee is entirely composed of undergraduates, all of whom are either presidents or past presidents of their class. The powers, procedures and responsibilities of the Honor Committee are largely defined in a document known as the Honor Constitution. The Honor Constitution is the central document in this case. It is readily available to all students at Princeton as it is reprinted in such publications as the *Princeton University Undergraduate Announcement; Rights, Rules, Responsibilities Guidelines for Students*; and *The Daily Princetonian*. It is also drawn to each student's attention at the time that he or she is accepted for admission. At that time every prospective student is sent a copy of the Honor Constitution and required to write a short statement displaying an understanding of its significance. It is undisputed that Mr. Clayton complied with this requirement for admission to Princeton, although neither party has been able to produce a copy of his statement. When the Honor Constitution is reprinted it is frequently accompanied by a few paragraphs of interpretative material. Mr. Clayton relies on the language of both the Honor Constitution and the interpretative materials in his claims before this court. Although the interpretative material probably should not be given the status of a full-fledged rule by which the University is bound, for summary judgment purposes I have accepted it as evidence of what the Honor Constitution, which does bind the University, means.

The first material dispute of fact which I will discuss, however, does not rely upon the interpretative material for its import but upon the language of the Honor Constitution itself. Article IV describes, among other things, the rights of a person accused of cheating when he or she appears before the Honor Committee. In part, that article states that those rights include "the right to have at any hearing an adviser of his or her choice from among the resident members of the University community, who may speak on his or her behalf and cross-examine the witnesses." Mr. Clayton had such an adviser, an undergraduate named Derek Kirkland. Mr. Kirkland's appearance on behalf of Mr. Clayton was the first time that he had appeared before the Honor Committee. Because he was unfamiliar with the Committee's procedures Mr. Kirkland met with a member of the Honor Committee named Chris Shields in order to discuss, among other things, the role of the defense advocate at the hearing. In a statement prepared by Mr. Kirkland in connection with Mr. Clayton's appeal to President Bowen, Mr. Shields' response is described: "Chris also told me that the committee did not view the defense advocate's role as that of an attorney for the defense. I was not supposed to act only on behalf of the accused but rather to make certain that a 'balanced' picture was presented. Chris also mentioned that the committee had in the recent past been unhappy with several defense advocates whom they felt to have been overly partisan." When every inference is drawn in Mr. Clayton's favor it must be concluded that these instructions, given by a member of the Honor Committee to a defense advocate, were contrary to the rights extended to Mr. Clayton by the Honor Constitution. The Honor Constitution speaks of an advocate who may appear on behalf of the accused and nowhere speaks of a countervailing duty to serve the committee by providing "balance". While it might be inferred that the advocate has a duty to be honest and not to intentionally mislead the committee, there is nothing in the Honor Constitution that suggests that the advocate should not be zealous in the cause and single-minded in loyalty to his or her client. To the contrary, the clear suggestion of the Constitution is that the advocate's loyalty is owed to the accused. Any undercutting of this loyalty, by placing the advocate in a position where partisanship is frowned upon and where "balance", which I interpret as a point of view balancing that of the accused, is expected from the defense advocate materially affects the accused's rights under the Honor Constitution. This is especially true because, under the Constitution, the accused is not even entitled to know the identity of the accuser or to be present during the accuser's testimony, only the accused's advocate is present and only the advocate may cross-examine. Obviously any inhibition of the vigor of this cross-examination, or subsequent analysis of the testimony, can be extremely detrimental to the accused's rights. The advocate is the accused's eyes and ears and his or her loyalty should be undivided. If Mr. Kirkland's advocacy was effectively compromised by Mr. Shields' remarks, as it appears to have been when every inference is drawn in Mr. Clayton's favor, then Mr. Clayton would be entitled to a verdict in his favor from this court.

On the other hand, when every inference is drawn in Princeton's favor, it cannot be said that Mr. Clayton was denied the effective assistance of counsel. The record shows that there was some cross-examination of the accuser and that certain flaws in the accuser's testimony were thereby developed. Mr. Kirkland also spoke vigorously on Mr. Clayton's behalf at several points in the hearing. Moreover, the very matter discussed above was presented to President Bowen by Mr. Kirkland in a written statement, so it appears that he did not feel such a loyalty to the Honor Committee as to unquestioningly accept everything that was said and done by that committee. In short, there is a material dispute of fact as to the question of effective assistance of counsel as defined by the Honor Constitution.

The second material dispute of fact that I will discuss involves the question of whether the Honor Committee was the appropri-

ate body to consider Mr. Clayton's case. At Princeton there are two bodies charged with adjudicating undergraduate disciplinary matters. The Honor Committee's jurisdiction is limited to violations of the Honor System which applies to written examinations. The other body, known as the Faculty-Student Committee on Discipline has jurisdiction over all disciplinary matters, academic and otherwise, that do not come within the Honor Committee's jurisdiction. Its jurisdiction includes cheating incidents when they do not occur during the course of a written examination. The question of which body determines the case is of more than esoteric interest to the accused. Aside from the fact that faculty and administration are represented on the Faculty-Student Committee, as opposed to only students on the Honor Committee, the Faculty-Student Committee has a much wider range of punishments available to it if it concludes that a student should be punished. This latter difference is of great importance to an accused. The Honor Committee's least onerous punishment was the one received by Mr. Clayton, i. e., a one year suspension. In contrast, punishments available to the Student-Faculty Committee range all the way down to a reprimand. In a case such as Mr. Clayton's it could certainly be concluded that the same factors which led the Honor Committee to impose its minimum available punishment might have led the Student-Faculty Committee to impose an even less substantial sentence.

*The Princeton University Undergraduate Announcement 1976–1977*, which was received by Mr. Clayton at some time before the alleged cheating incident, describes the Honor System as follows:

At Princeton all written examinations are conducted under the Honor System. By its terms the undergraduates themselves assume full responsibility for honesty in written examinations. On each examination paper the student writes out the following statement and signs it: *I pledge my honor that, during this examination, I have neither given nor received assistance.*

\*    \*    \*    \*    \*    \*

.... In accordance with the assumption of full responsibility by the undergraduates, examinations are not supervised. The professor or instructor in charge distributes the examination papers, waits for a short time for any questions, and then leaves the room, returning at the end of the stated period to collect the answer books.

The plaintiff contends that this language, along with similar language in other University publications, defines the boundaries of the Honor System and thereby limits the jurisdiction of the Honor Committee, which by the terms of Article I of the Honor Constitution is constituted to deal "with all cases involving violations of the Honor System." The plaintiff draws two jurisdictional requirements from the above-quoted language that he claims were not met by the lab practical that he allegedly cheated on. First, it is claimed that the Honor System only applies to examinations upon which the pledge is either written by the student or requested by the instructor. It is undisputed that the test taken by Mr. Clayton did not provide a specific space for the pledge as is frequently done on Princeton examinations, nor did the instructor request that the pledge be placed upon the paper at any time before, during, or after the lab practical. Second, it is claimed that the Honor System only applies when no faculty member is present in the examination room proctoring the test. It is undisputed that a teaching assistant was present throughout most of the time that Mr. Clayton was taking his lab practical, although it is similarly undisputed that the teaching assistant was not present at the time that Mr. Clayton allegedly cheated.

When every inference is drawn in Mr. Clayton's favor it can be concluded that the Honor System applies only when the pledge is requested and an examination is unproctored. These two conditions are almost always mentioned in material describing the Honor System and the pledge in particular frequently has a special space reserved for it on Princeton examinations. The absence

of these two conditions could justify the conclusion that the Honor Committee was without jurisdiction to consider Mr. Clayton's case and that it should have been considered by the Student-Faculty Committee instead.

When every inference is drawn in Princeton's favor, however, a different conclusion must be reached, *i. e.*, that the Honor System applies to every written examination in the common meaning of those words. Mr. Clayton was being tested on his knowledge by the lab practical and his answers were written ones. When every inference is drawn in Princeton's favor it can be concluded that those two facts are all that are necessary for the Honor Committee's jurisdiction and that Robert Clayton was, therefore, tried by the appropriate body.

I have concluded that there are at least two material disputes of fact as to whether Princeton fulfilled its obligation to materially comply with its own disciplinary rules. That conclusion, however, is not sufficient to end the analysis of the summary judgment motions. Princeton argues with respect to both of the questions that I have discussed that Mr. Clayton waived his right to raise those issues in this court because he did not present them to President Bowen for review in connection with his appeal of the Honor Committee's proceedings. "Although the term 'waiver' is given varying definitions in varying contexts, it is generally taken to be the intentional relinquishment of a known right." *East Orange v. Board of Water Commissioners*, 41 N.J. 6, 17, 194 A.2d 459 (1963). When every inference is drawn in Mr. Clayton's favor it cannot be concluded that he intentionally relinquished known rights with regard to either issue that I have discussed.

■ With regard to the question of whether the effectiveness of Mr. Clayton's counsel was undercut by the instructions that Mr. Kirkland received from Mr. Shields it is clear that this incident was drawn to President Bowen's attention in Mr. Clayton's appeal. While the principal argument made from that incident before President Bowen was different from the one that I

have discussed in this opinion, namely that the reported conversation was evidence of the Honor Committee's predisposition to convict Mr. Clayton without a fair trial, when every inference is drawn in Mr. Clayton's favor it must be concluded that he was sufficiently concerned with the incident and what he viewed as its impropriety to draw it to the President's attention. In other words, it can be said that Mr. Clayton rather than knowingly relinquishing rights arising from this incident attempted to pursue them in his appeal and did not, therefore, waive them.

■ As to the jurisdictional issue it seems clear that this issue was not brought to President Bowen's attention in Mr. Clayton's appeal. When every inference in Mr. Clayton's favor is drawn from the depositions, however, it can be said that this issue was raised with both student members on the committee and with a Dean of the University who served as an adviser to the Honor Committee and that it was dismissed as meritless by both the students and the Dean. No formal ruling was ever made on this issue by anybody at Princeton since, when every inference is drawn in Mr. Clayton's favor, the student's were convinced that the Dean's interpretation of the Honor Committee's jurisdiction was conclusive. Moreover, in Mr. Clayton's formal letter of appeal to President Bowen he states: "I understand, however, that an appeal to you should not ask you to re-hear the evidence on the substance of the case, but that unfairness in procedures should be the basis for an appeal." When every inference is drawn in Mr. Clayton's favor from this sentence it can be inferred that he was instructed to only raise issues addressing the fairness of the procedures actually followed, thereby eliminating such issues as whether the Honor Committee, even if it handled itself in a proper and fair manner, was without jurisdiction to consider the case at all. In short, it cannot be said on the present record, when every inference is drawn in Mr. Clayton's favor, that he knowingly relinquished his right to challenge the Honor Committee's jurisdiction.

Although it was not raised by the parties, an issue closely related to the waiver issue in the present case is the question of whether Mr. Clayton properly exhausted the private law remedies available to him under the Princeton Honor System. Such exhaustion is generally required in New Jersey. *Garrow v. Elizabeth General Hospital and Dispensary*, 79 N.J. 549, 660–61, 401 A.2d 533 (1979). However, for the reasons detailed in the discussion of the waiver issue, I conclude that when every inference is drawn in Mr. Clayton's favor it can be concluded that he exhausted all available procedures on the two issues under consideration.

To sum up, I have concluded that with respect to two issues there are material disputes of fact that require a denial of both parties' motions for summary judgment. It should not be inferred from the fact that I have limited my discussion to two areas that I consider to be of importance to the ultimate decision of this case that I have discounted the importance of other facts that I have not discussed. I have simply not found it necessary to reach those facts in order to decide the motions before me today. I have reached no conclusions as to whether material disputes of fact exist as to those other issues or not. Although Fed.R.Civ.P. 56(d) gives me the authority on a motion of this sort to analyze all of the facts and to limit the factual issues for trial even if the motion is denied, I have decided not to do so. I believe that at the eventual trial of this case it would be most beneficial for all of the facts surrounding the Honor Committee hearing to be developed by the evidence whether they are substantially in dispute or not. This is because issues such as the question of whether Mr. Clayton was denied the effective assistance of a defense counsel in the context of this hearing may rely upon subtleties in the record that are understood better at trial than upon motion.

Similarly, it should not be concluded that because I have limited my discussion of the law to the issue of whether Princeton substantially complied with its rules that I have decided any of the other legal issues presented by the parties. I have simply concluded that a New Jersey court would begin its analysis of this case by determining whether Princeton followed its rules. Issues such as whether Princeton's rules comply with the dictates of public policy would only be considered after a court had concluded that Mr. Clayton was not entitled to relief on the question of whether the rules were followed. Because I have found a material dispute of fact on the issue of whether the rules were followed, I have addressed no other issues. I would like to note, however, that Princeton moved for summary judgment as to the plaintiff's claims under the Fifth Amendment, and the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g. Although Mr. Clayton submitted extensive briefings in connection with the motions this morning, he chose not to brief either of those two issues. At oral argument, Mr. Clayton's counsel made it clear that these claims were no longer being pursued. I will, therefore, grant Princeton's motion for summary judgment on those issues.

Before closing this opinion there are two other issues that I would like to briefly address. They are whether trial of this case should be limited to review of the record below and whether any equitable remedy other than remand to either the Honor Committee or the Student-Faculty Committee is available to Mr. Clayton.

██ In its motion papers Princeton has moved to have this action stricken from the trial calendar on the grounds that the Court's sole function is to review the record below. In support of this proposition Princeton principally relies upon *Sill v. Pennsylvania State University*, 462 F.2d 463 (3d Cir. 1972). I do not read the *Sill* case as standing for as broad a proposition as Princeton argues. As I mentioned earlier, *Sill* was a Fourteenth Amendment Due Process case and involved none of the common law doctrines involved in the present case. Moreover, the language relied upon by Princeton does not have the broad sweep Princeton attributes to it. In *Sill* the court wrote that

The district court, after carefully reviewing the transcript of the evidence before the panel, the exhibits received into evidence, the findings and recommendations of the majority panel members, as well as that of the dissenting panel member, and the additional material submitted to the president by some of the students after the disciplinary action was taken, concluded that substantial evidence supported the findings of the majority of the panel which were accepted and adopted by the president. In doing so the district court properly performed its function. It was not for that court, as it is not for us, to retry de novo the charges against the appellants. Upon our review of the record we are satisfied that the district court did not err in its conclusion.

462 F.2d at 470. This language addresses the question of the underlying guilt or innocence of the charged students. *Sill* simply does not address the question of what evidence a court should consider in determining whether a University has substantially complied with rules that it is bound to comply with as a matter of state law. I do not view Mr. Clayton's case as presenting the issue of whether he cheated or not. As the preceding portions of this opinion indicate, the trial of this case will be limited, at least initially, to the question of whether Mr. Clayton received his due from Princeton. The question of his guilt or innocence is irrelevant to that inquiry. I certainly do not intend to retry that issue. As to the issues that will be tried I see no reason to deny either party the right to present evidence outside of the record below to the court. The New Jersey courts receive evidence relating to the proper interpretation of written documents as a matter of course. *See, e. g., Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 96 A.2d 652 (1953). It is also clear to me, from the proofs already developed in this case, that many of the plaintiff's claims, such as the issue of whether the effectiveness of his defense advocate was compromised, depend as much upon what went on in student rooms as upon what happened on the record. To limit review of such issues to the record would be to effectively eliminate any review. I have, therefore, decided to deny the defendant's motion to strike this case from the trial calendar.

■ Finally, we come to the question of remedy. It is Mr. Clayton's hope that if he prevails in this litigation then the court will order that his transcript be expunged and that no new hearing be held by anybody at Princeton to redetermine the question of his guilt or innocence. In support of this prayer for relief Mr. Clayton principally relies upon what he claims is a prejudice existing at Princeton that would deny him a fair rehearing in order to vindicate the Honor Committee and the Honor System. Princeton, of course, denies that any such prejudice exists. Although the parties have briefed this issue I believe that it is premature to consider issues relating solely to remedy when it is not at all clear that the plaintiff has been wronged in any way. It will be time enough to solve the remedy problems after it is determined that the plaintiff is entitled to any remedy at all. This is a non-jury case in all aspects except the measure of the money damages if it is determined that Mr. Clayton is entitled to money damages. Obviously the court retains a great deal of flexibility in the orderly handling of this lawsuit. I would note, however, that in virtually all cases a finding for the plaintiff is followed by a remand to the appropriate decisional body established by the private law binding the parties. *See, e. g., Garrow v. Elizabeth General Hospital and Dispensary, supra*, 79 N.J. at 564 n.3, 401 A.2d 533; *Tedeschi v. Wagner College, supra*, 49 N.Y.2d 652, 427 N.Y.S.2d at 766, 404 N.E.2d 1302. Nevertheless, if Mr. Clayton convinces the court that Princeton could not possibly act objectively and in good faith on remand he may be entitled to the remedy he seeks. At oral argument Mr. Clayton's counsel also suggested that the Honor Constitution itself might prohibit a rehearing. If this can be proven then it also may entitle Mr. Clayton to the remedy he seeks. Neither of these conclusions, however, could be drawn solely on the basis

of the papers before me and the question is best preserved until the appropriate time.

In conclusion, I have denied the cross-motions for summary judgment except for Princeton's motion with respect to Mr. Clayton's Fifth Amendment and 20 U.S.C. § 1232g claims, which has been granted. I have also denied Princeton's motion insofar as it sought to have this matter stricken from the trial calendar. Counsel will prepare an appropriate order.