■ In the Matter of ROSE GARNER et al., Petitioners, v TUCKAHOE HOUSING AUTHORITY, Respondent. — Proceeding pursuant to CPLR article 78 to review a determination of the respondent dated May 27, 1980 and made after a hearing, which terminated the tenancy of petitioners. Petition granted, on the law, without costs or disbursements, determination annulled, and the matter is remanded to the respondent for further proceedings consistent herewith. Petitioners have been tenants of the respondent

Tuckahoe Housing Authority (the Authority) since about 1963. As Corrine Birdie, the Executive Director of the Authority, conceded, petitioner Rose Garner had never disturbed any of her neighbors and no complaints have ever been made against her. In fact, Ms. Birdie had concluded that neither Mrs. Garner nor the Garners' three children were a threat to the health, safety or welfare of other tenants. Nor had Ms. Birdie ever received any reports of petitioner Roy Garner, Rose Garner's husband, "threatening any tenant or anyone", with the exception of "talk" that Ms. Birdie had heard with respect to an incident that occurred on or about September 15, 1979. On or about that date, Mr. Garner was apparently involved in a violent incident which was found, after the hearing in question, to have occurred "in the vicinity of the Project". By letter to petitioners dated October 18, 1979, which apparently served as the notice of termination which the parties' lease agreement requires be served as a prerequisite to the proper termination of petitioners' tenancy, Ms. Birdie requested petitioners to vacate their apartment within 30 days. Although the lease requires that such notice "state reasons for the termination", the letter made no direct reference to any allegedly undesirable conduct or violations of the lease by any member of petitioners' family. Instead, after recounting Birdie's unsuccessful efforts to have petitioners discuss with her "the events that occurred on September 14-16th weekend", the letter stated, "However, to date, neither member of the family has been in contact with this office. Therefore, you are requested to move from the premises * * * within thirty days". Under the applicable grievance procedure, a tenant who complains of an action of the Authority, such as a termination of tenancy, is entitled to a hearing at which, after the tenant has "ma[d]e a showing of an entitlement to the relief sought", the Authority "must sustain the burden of justifying [its] action". Petitioners requested such a hearing. At the hearing, Ms. Birdie testified that the decision to terminate the tenancy of petitioners was made pursuant to a provision in the Authority's statement of policies, which provides in pertinent part: "Any family * * * presently occupying a unit which has a history which is deemed after thorough investigation and consultation with appropriate social agencies and other sources to represent an undesirable influence and affect upon the safety, health or morals of the occupants of the project ... may * * * be * * * ineligible for * * * continued occupancy." Birdie further testified that it had been on the basis of its understanding of the nature of Mr. Garner's participation in the incident that had occurred on or about September 15, 1979[1] and the fact that Mr. Garner had been convicted in approximately 1970 of criminally negligent homicide that the Authority determined to terminate petitioners' tenancy. The Authority had considered Mr. Garner's prior conviction even though the conduct upon which it was based was unrelated to the Authority or its tenants and Mr. Garner had been permitted to resume his residence on the premises of the Authority upon his release from incarceration in 1973. By letter dated Sep-

---

1. On the Monday morning following the incident, Ms. Birdie "heard talk that there has been an incident over the weekend regarding Mr. Garner and another gentleman who had a fight, and there was a gun involved, and that the gun had been used, and that Mr. Garner had been beaten up by the other man after he shot at him and missed and had gone to the hospital after Mr. Garner had shot at the man and missed." Upon Ms. Birdie's inquiry, the police merely advised her that "there had been an occurrence". Insofar as reflected by the record, this was the sum total of the information which Ms. Birdie possessed before the decision was made to terminate petitioners' tenancy, except for statements made to her by Mr. Garner on September 26, 1979, which are more fully discussed below. There is nothing in the record to suggest that anyone other than Birdie was involved in the Authority's investigation of petitioners' case. Indeed, it appears that it was she alone who decided that their

tember 24, 1979 Ms. Birdie requested that the petitioners come to her office at 10:00 A.M. on September 28 to "review the facts" of the incident in question. On September 26, Mr. Garner telephoned Birdie in response to her letter. He told Ms. Birdie that the incident had begun with an argument at the "A.C. Jefferey Post". A man had struck Garner, followed him, and then struck him again. Garner stated that he had not started the incident, that he was very upset, that he did not want to discuss the matter further, and that he would have his wife or lawyer telephone Ms. Birdie. Sometime thereafter, Mrs. Garner telephoned Birdie and told her that she had to work on September 28, but she would talk to her attorney, do what he suggested, and then contact Ms. Birdie. Since Birdie had not heard from petitioners by October 18, 1979, she sent them the letter described above, requesting them to vacate their apartment and advising them that if they felt aggrieved by "this discisšion" *[sic]*, they could request a hearing. In a reply letter, Mrs. Garner stated that she had advised Ms. Birdie that she did not wish to speak personally with her on the matter, but that Birdie could contact petitioners' attorney, whose name and telephone number she provided. There is nothing in the record to suggest that Ms. Birdie ever contacted petitioners' attorney. Although she acknowledged that the tenants' committee represented all the tenants of the Authority and that she conferred with that committee on a regular basis concerning "problems in the Housing Authority", Ms. Birdie testified that she had never discussed petitioners' case with the tenants' committee. Birdie explained her failure to consult both social and other agencies and the tenants' committee on the ground that the petitioners had failed, in the first instance, to discuss the situation with her. In his decision, the hearing officer accepted this explanation as adequate, concluding, among other things, that any claim that the Authority had "failed to investigate alternative remedial methods with social agencies" or take "alternative action" was "waived" by petitioners' refusal to "enter into discussions with [the Authority] regarding Mr. Garner's incident and any of his sociological problems." For this and other reasons, he determined that the Authority had "acted properly in issuing a notice of termination of tenancy". The Authority adopted his findings. We annul this determination. It is our conclusion that under the applicable provision of the Authority's grievance procedure,[2] the petitioners made the requisite "showing" at the hearing "of an entitlement to the relief sought", but the Authority did not "sustain the burden of justifying [its] action" since it did not sufficiently establish that its determination to terminate petitioners' tenancy was made only after all procedural prerequisites had been met. While a housing authority has some degree of discretion in determining whether a family of tenants represents an undesirable influence such as to justify the termination of its tenancy, the Authority must arrive at its decision in accordance with, at minimum, the provisions which authorize termination of tenancy on that ground (see *Tedeschi v Wagner Coll.,* 49 NY2d 652). Under

tenancy should be terminated. It should be noted that although the incident that occurred on or about September 15, 1979 resulted in Mr. Garner's pleading guilty to a reduced charge of reckless endangerment in the second degree, a misdemeanor, for which he was sentenced to pay a $500 fine, his plea was not entered until December 4, 1979, about one and one-half months after the Authority issued its notice of termination. The record does not reflect whether the man involved in the altercation with Mr. Garner was a tenant of the Authority.

2. It appears that the parties disregarded the order of proof which is contemplated under this provision of the grievance procedure, since the Authority presented its case first. However, that apparent procedural irregularity is not adverted to by any party and does not require a different result in this case.

the Authority's own policy statement all tenants of the Authority have a right to have a "thorough investigation and consultation" conducted before the Authority may properly determine to terminate their tenancy on the ground of undesirability. While the importance of compliance with the procedural aspects of this provision is readily apparent, the record of the hearing demonstrates, in retrospective fashion, that the need for such compliance was particularly important in the case of petitioners. Since 1963 no conduct on the part of petitioners' family had had a demonstrably adverse impact upon the Authority or its tenants, except, perhaps, for Mr. Garner's conduct "in the vicinity of" the Authority premises on or about September 15, 1979. A former commissioner of the Authority, who had served in that capacity for almost 20 years and who had been chairman of the Authority for eight years, testified that he had known petitioners "all of their lives", that he did not believe that Mr. Garner was "a violent person" and that he did not believe that he would be a detriment to the health, safety or welfare of other tenants. Although he had apparently communicated that view to Ms. Birdie before the hearing, there is no evidence in the record whether he did so before the Authority decided to terminate petitioners' tenancy. The chairperson of the tenants' executive committee, who had resided on the Authority's premises for about 24 years, testified that both in her opinion and in the opinion of the tenants' committee, the petitioners should not be evicted because they "haven't given anybody any trouble before this one incident that we know of". Moreover, while Mr. Garner was eventually convicted of a misdemeanor because of his involvement in the incident in question, the fact that his sentence was a $500 fine, even though he had a prior felony conviction, suggests that his conduct was not of a heinous nature. Against this background, in particular, we cannot construe the Authority's policy statement as authorizing the Authority to have terminated petitioners' tenancy without having conducted the kind of "thorough investigation and consultation" contemplated thereunder merely because of petitioners' alleged waiver of those procedural entitlements. We note initially that nothing in the terms of the policy statement suggests that the Authority's obligation in this respect is subject to waiver. Moreover, since it does not appear that the policy statement is expressly incorporated into the lease agreement, there was an obligation upon the part of the Authority to call to petitioners' attention the investigation and consultation procedure provided for in that provision (see *Tedeschi v Wagner Coll.*, 49 NY2d 652, 661, *supra*). This is particularly true since Ms. Birdie's letters to petitioners defined the scope of the matters she wished to discuss with them as "an incidence of violence in which you were involved" and "the events that occurred on September 14-16th weekend", respectively, and made no reference to the Authority's obligation to consult with social or other agencies. Since petitioners were never advised by the Authority that it was seeking anything more from them than a factual account of the incident, they did not "refuse to enter into discussions with [the Authority] regarding * * * any of [Mr. Garner's] sociological problems", as found by the hearing officer. Accordingly, bearing in mind that a waiver is an intentional relinquishment of a known right *(Schiff Assoc. v Flack*, 51 NY2d 692), we cannot conclude that, assuming that petitioners refused to discuss the incident that occurred on or about September 15, 1979, they thereby waived their right to the procedural protections afforded by the provision of the policy statement in question. Moreover, petitioners' refusal to have the incident discussed was not a complete one. On September 26, Mr. Garner, in effect, admitted to Ms. Birdie that there had been an incident, but also indicated that he had not

started it and had tried to walk away from it. For further discussion of the matter, petitioners referred Birdie to their attorney. We cannot say that this referral evidenced an indifference to petitioners' procedural rights since at the time discussion was sought, Mr. Garner was facing an unresolved criminal charge arising out of the very incident in question. Concededly, the Authority could reasonably have concluded that Mr. Garner's refusal to give a more complete personal account of the incident was some indication of culpable conduct on his part. However, it could not properly conclude that that refusal relieved it of its responsibility to not only attempt to determine more precisely the nature of Mr. Garner's conduct and the factual context in which it occurred, but also, once that determination had been made, to determine, upon inquiry of petitioners and others, whether the petitioners' tenancy should properly be continued, even though Mr. Garner had engaged in such conduct. Since the Authority failed to follow its own rules in determining to terminate petitioners' tenancy, that determination must be annulled. Mollen, P. J., Margett, O'Connor and Weinstein, JJ., concur.