Eetitioner was dismissed from NYU’s dental college, without the possibility of readmission, after a Feer Review Board on Ethics and Frofessionalism (ERB), convened pursuant to NYU’s “Code of Ethics and Frofessional Conduct, Feer Review Board Froposal FINAL 2.6.09” (the 2009 Code), found that she forged a patient treatment record and presented multiple patient encounter forms that she knew to be false in order to obtain the Fractice Model Values (PMV) credits that she needed to graduate. Petitioner argues that the disciplinary proceeding should have been conducted under NYU’s “Code of Ethics and Professional Conduct Approved EMC 080405” (the 2005 Code), that NYU’s determination is contradicted by the evidence, and that the penalty of expulsion without the possibility of readmission shocks the conscience. For the reasons that follow, we conclude that irrespective of whether the 2009 Code or the 2005 Code is *503 the applicable code, NYU did not substantially comply with its own published guidelines and policies. Thus, its determination expelling petitioner must be annulled as arbitrary and capricious.
The PMV requirement was created by the “NYUCD Practice Model Plan” dated May 17, 2005. Although NYU claims that production goals were expected to help students “gain more experience and knowledge in delivering comprehensive care,” and to “graduate efficient and ethical practitioners ready to meet the challenges of ‘the real world,’ ” the PMV requirement was not based on hours of service. Rather, in addition to certain competency requirements, the program required students “to meet defined production level/goals,” or, in other words, to generate a specified amount of revenue for NYU.
From its inception, the program appears to have been the subject of controversy. The minutes of the NYU Space and Revenue Committee Meeting held on April 5, 2006, state: “Students feel exploited over pressure to generate income in clinics, feel ‘overwhelmed,’ and that they pay too much feel like [sic] ‘mules.’ Faculty feel there is significant growth potential there. The point was made that we use dollars in the same way other schools use points, but it’s the same financial requirement, and we’re doing them a service by preparing them for their later practice. Resentment may fade, and the incentive and bonus program will really help. Clinic income will have to be a big revenue source.”[2]
It is from this obligation to generate revenue that petitioner’s troubles arise. After passing all of her academic courses, competency exams, and both parts of the National Board Dentistry Examinations, at 9:54 p.m. on Monday, May 25, 2009— the night before she was supposed to graduate — petitioner received an email from her group practice director, Dr. Harry Meeker, advising her that he was “uncertain about [her] status for graduation. The paper that I have with me says you still owe me something.” On Tuesday, May 26, 15 minutes before she was to graduate, Meeker told petitioner that she was short on PMV credits.
Petitioner claims that this was the first time she was informed of the PMV shortfall. Meeker allegedly disputed this. According to the report of the PRB’s Investigating Panel, comprised of two students, Meeker told the investigators, without providing sup *504 porting documentation, that petitioner was supposed to meet with him three to four weeks before graduation to check graduation requirements, but did not do so, and that he notified petitioner of the deficiency in PMV credits in mid-April, and provided her with regular notices about it thereafter.
However, petitioner avers that Meeker never contacted her to set up an appointment or mentioned that such a meeting was needed. She states that after being told of the shortfall on graduation day, in a state of panic she told Meeker that she was moving to Boston the next day to start a pediatric dentistry residency at Boston University. Meeker replied that she should find him and Ivan Cornejo, the clinic manager, at the post-graduation reception to resolve the problem. At the reception, Cornejo, who told the Investigating Panel that he was not aware that there was a problem until that morning, advised petitioner to call Meeker and him the next day. Again, Meeker’s version allegedly differed. According to the Investigating Panel Report, Meeker told the student investigators that on graduation day petitioner “knew she was deficient [in her PMV requirement] but she thought she did not have to do it.” Petitioner denies this.
In any event, on May 27, 2009, Meeker advised petitioner by email that “Your PMV requirement as of today is $19,093 and the target is $21,000. You should come back to make the requirement before your diploma can be awarded.” Petitioner replied that she was already in Boston to start her residency orientation and that she would have fulfilled the requirement had she been timely advised of the deficiency and the need to remedy it. By email dated May 29, 2009, Meeker responded:
“Perhaps one of the reasons [the PMV] was not attained was due to the fact that you only treated patients in 10 out of 36 sessions in April, and incredibly did not see any patients in May
“If you had treated even just an average number of patients during these 53 sessions that you did not attend, . . . then you would have achieved and surpassed your PMV well before May.”
By email dated May 30, 2009, petitioner disputed Meeker’s contentions and tendered a proposal to resolve her deficiency in PMV credits: “I am sick with grief from this situation. I have started my orientation in Boston and cannot return, nor do I have any patients to treat at NYU. I was finishing up my patients in April and in May. I had Invisalign and [oral surgery] consultations with patients and several disappointments [undoubtedly meaning cancellations]. The only major treatment I could’ve done was on my bridge patient because he needs a *505 total of 3 FPDs. This was the patient that you said I could not do another bridge on because there are others who needed that requirement. . . Additionally, I have been dealing with medical issues the past couple months. I am a deeply private person and did not wish to discuss this. It has been very hard and I do not want sympathy. When I checked my requirements back a few weeks ago I was fine ... I do not know if some procedures were entered incorrectly but now I do not have enough of the PMV which I thought I did. If this was the case I certainly would not have been okay with doing only consultation and[ ] referrals and disappointments the past few weeks. I have to be in MA to start my training but I also need to graduate. I worked hard over the past four years and tried very hard to not cause any problems and follow the guidelines. I worked hard to get accepted into a specialty program and I hope with all my heart that all this hard work does slip away [sic]. I regret deeply that this has happened and need your help. I would pay the school back the money that I did not earn for treatment if needed. I am stuck between a rock and a hard place. I have 11 family members in Illinois that are willing to help me by purchasing the at-home bleaching treatments, which at $175 each for 11 people would be $1925 and would put me over the needed PMV . . . PLEASE email me asap [sic] if this will work.”
Although other students had allegedly been allowed to purchase the home bleaching treatments to satisfy their PMV requirements, petitioner’s offer was rejected.
Petitioner met with Meeker at the clinic on June 1, 2009. According to petitioner, Meeker told her that “it would have all been taken care of if [she] had not called or emailed [the clinic] because doing so made [his supervisor] Dr. [Mark] Wolff aware of the situation,” and that she was “making [Meeker] look bad and it would reflect poorly on him in his upcoming performance review.”[3]
David Hershkowitz, an instructor at NYU, then joined the meeting. According to the Investigating Panel Report, Meeker told the student investigators that petitioner agreed that she “would continue patient care to complete the [PMV] requirement,” and Hershkowitz told them that he “left [petitioner] with Dr. Meeker so that they could place patients on her roster and make appointments with patients to . . . help her attain her goal.”
Petitioner denies this. She claims that both Meeker and *506 Hershkowitz acknowledged that there were no patients on her roster and told her that they would not let her treat any clinic patients because the patients had already been assigned to other students. Meeker instructed her to just get the money and Hershkowitz told her, “You’re not getting any of your patients back. You have to give us the money or you’re not going to graduate.” Towards this end, Luz Tartaglia, Hershkowitz’s secretary, told petitioner to write out the billing information “as if you did them [i.e., the treatments]” for one of the patients. Petitioner then gave Tartaglia four encounter forms for a total of $2,050, and paid $200 in cash and $1,850 on her credit card, which Tartaglia accepted with full knowledge that petitioner was paying the fees from her own funds.
The Investigating Panel Report states that when Hershkowitz was told that petitioner had completed her PMV requirements, he looked into the matter and determined that she did not actually do the work. He confronted petitioner, who allegedly admitted that she had fraudulently entered treatment on one chart, and fraudulently signed a “start” on the encounter so the receptionist would enter treatment. The report also states that petitioner told the student investigators that she “did something that was out of [her] character” and admitted “forging treatment records for 4 patients . . . and forging a chart entry for one patient.” Petitioner allegedly attributed this conduct to confusion, panic, mental health issues, other medical problems, and the failure of Meeker to appropriately guide and accommodate her.
Petitioner avers that she admitted creating the encounter forms but that at no time did she state that she had falsified a patient’s chart or records. She maintains that she took this action based on a good faith belief that she was following the instructions of program faculty who told her that she had to produce the PMV fees without having any patients on her roster or she would not be allowed to graduate.
On July 16, 2009, NYU sent petitioner a letter notifying her that “the [PRB] convened and, based upon the report of its Investigation Panel, determined that you made a fraudulent entry in a patient’s chart and, in addition, forged fraudulent treatment records for multiple patients. Based upon this finding, the [PRB] has recommended that you be dismissed from the College.” The letter further advised petitioner that the College Review Board had “determined that the investigation was thorough and the sanction reasonable and appropriate.” When petitioner objected on the ground that she had been dismissed without a hearing, NYU withdrew the July 2009 determination *507 because it had admittedly failed to follow its own internal procedures, which provided that a hearing had to be held before a student could be expelled.
On October 7, 2009, the PRB, which is comprised of dental college students, held a “hearing” and voted unanimously to dismiss petitioner, without the possibility of reinstatement. The College Review Board, consisting of three faculty members, allegedly confirmed that decision by a majority vote. Dr. Anthony Palatta, the Assistant Dean for Student Affairs and Admissions, informed petitioner of the decision and of her right to appeal to the dean of the dental college. While this letter is in the record, neither the PRB nor the College Review Board determinations have been produced.
Petitioner appealed, arguing among other things that Meeker was “negligent in the administration of his responsibilities, failed to complete the required Progress Reports, and ha[d] repeatedly lied and defamed [her] during the [PRB] process,” and that the “hearing was conducted without due process and in violation of the [2005 Code].” Dean Charles Bartolami upheld the decision of the College Review Board.
Meanwhile, before the PRB made its finding, petitioner was instructed to go to the clinic and complete her PMV requirement. According to petitioner, although Meeker and Hershkowitz still refused to assign patients to her roster, she found them on her own and “reached the required amount of PMV on June [8, 2009].” Nonetheless, Assistant Dean Palatta allegedly told petitioner that she “needed to keep coming to clinic and continue treating patients to earn even more PMV” Petitioner complied, ultimately generating a total of $23,648 in revenues, which exceeded the $21,000 goal. At that point, petitioner had already satisfied all academic requirements for graduation. Accordingly, her expulsion, based on charges of “inappropriate professional behavior,” under a Code of Ethics, was undeniably disciplinary in nature (see e.g. Matter of Katz v Board of Regents of the Univ. of the State of N.Y., 85 AD3d 1277 [3d Dept 2011], lv denied 17 NY3d 716 [2011]).
Judicial review of an academic institution’s disciplinary determinations is limited to whether it “substantially adhered to its own published rules and guidelines” and whether the determinations are based on “a rational interpretation of the relevant evidence” (Matter of Katz, 85 AD3d at 1279; see also Tedeschi v Wagner Coll., 49 NY2d 652 [1980]). “When a university has not substantially complied with its own guidelines or its determination is not rationally based upon the evidence, the determination will be annulled as arbitrary and capricious” *508 (Matter of Hyman v Cornell Univ., 82 AD3d 1309, 1310 [3d Dept 2011]).
Petitioner argues that NYU did not substantially comply with its published guidelines because the disciplinary proceeding should have been conducted under the 2005 Code. She contends that NYU’s attempt to replace the 2005 Code with the 2009 Code was ineffective because it did not conform to the requisite procedures for rule changes, and that she was prejudiced by the changes in the new code. Supreme Court found that petitioner’s reliance on the 2005 Code was misplaced and that NYU substantially complied with the guidelines and procedures set forth in the 2009 Code. Upon our review of the record, we find that NYU did not substantially comply with its own published guidelines under either the 2009 Code or the 2005 Code.
If the 2005 Code is the applicable code, then plaintiff clearly was prejudiced when NYU applied the 2009 Code. Under the 2005 Code, the Council on Ethics and Professionalism was composed of both faculty and student members, and the Investigating Panel was composed of one student and one faculty member. Under the 2009 Code, the PRB and Investigating Panel were composed solely of students. Dr. Eric Ploumis, petitioner’s faculty advisor at the PRB hearing, averred that an investigating panel made up of two students instead of one student and one faculty member is “much more susceptible to influence from the dean and administration of the college of dentistry. Faculty, having tenure, are far more independent and objective in such matters.”
Further, under the 2005 Code, a student facing suspension or dismissal had “the right to be accompanied at the hearing by an adviser ... or an individual from outside the University, or legal counsel from outside the University.” Under the 2009 Code, the student had the right only to an adviser from within the University. Despite a request from her psychotherapist, petitioner was not permitted to have an attorney present, even though NYU knew that she was suffering from a mental disability at the time of the hearing. Indeed, NYU “had a mental health therapist at the hearing in the event [she] had a nervous breakdown.”
On the other hand, the 2009 Code provides that “[w]hen sanctions of extended suspension or dismissal from the College are under consideration, a hearing before the Board is mandatory” (emphasis added). NYU admittedly did not follow the 2009 Code in the first instance when it issued its July 16, 2009 dismissal without affording petitioner a hearing before the PRB. While NYU claims that it corrected this omission as soon as petitioner *509 brought it to the school’s attention, at that point the PRB had already determined that petitioner had committed an ethical violation warranting dismissal, and the determination had been reviewed and approved by the College Review Board.
As to the hearing itself, the 2009 Code requires that “[t]he charges and supporting evidence shall be presented by the Investigating Panel.” Neither Hershkowitz or Meeker testified; the case against petitioner was based on the Investigating Panel Report. Tartaglia was not called to testify even though the Investigating Panel had not previously interviewed her and a key element of petitioner’s defense was her claim that Tartaglia specifically instructed her, in conformity with Hershkowitz and Meeker’s statements, to pay the PMV fees and fill out encounter forms “as if you did them,” and accepted the fees knowing that they were being paid by petitioner herself.
Moreover, neither the allegedly fraudulent patient chart nor the encounter forms are annexed to the Investigating Panel Report. There is no proof in the record that those documents were reviewed by the investigators, the PRB, or the College Review Board. Nor was any evidence submitted supporting Meeker’s claim that petitioner had been notified of a shortfall in her PMV goals before the eve of graduation. Further, there is no evidence demonstrating the reliability of the statements Hershkowitz and Meeker purportedly made to the Investigating Panel.
The 2009 Code also provides that “[t]he hearings shall be conducted in a manner to achieve substantial justice and shall not be restricted by the rules of evidence used in a court of law. Members of the Board may address questions to any party to the proceedings or to any witness called by the parties or by the Panel. Each side shall have a fair opportunity to question the witnesses of the other. Questions shall be posed through the Chair, unless the Chair determines otherwise. The Board may in its discretion limit the number of witnesses and may accept affidavits. All matters of procedure not specified in this Code shall be decided by the Board in its discretion” (emphasis added).[4]
The PRB’s determination was not based on written statements by persons with knowledge, or their oral testimony. The hearsay in the Investigating Panel Report was not subject to cross examination, and petitioner was not afforded any, let alone a fair, opportunity to cross-examine the witnesses whose accusa *510 tions were the basis of the charges lodged against her. Additionally, and of great significance, certain matters of procedure were determined by Dean Palatta, rather than the PRB, as required by the 2009 Code.
In advance of the hearing, petitioner sent a letter to Palatta requesting, “as a reasonable accommodation of [her] medical condition, which ha[d] left [her] in an anxious and weakened state, [that] [her] adviser be permitted to question witnesses and summarize documents.” She also requested various documents. Palatta refused.
Professor Ploumis averred, without contradiction, that Palatta “made it very clear that [Ploumis] was not permitted to ask questions, present evidence, or make objections on [petitioner]’s behalf during questioning by the [PRB].” Palatta “threatened that, were [Ploumis] to interject or participate in any other way [besides advising petitioner], [he] would be removed from the hearing and [petitioner] would have to proceed alone.” Further, on October 13, 2009, Ploumis sought out Palatta to find out why a decision had not been issued, and Palatta “made it abundantly clear that no matter what the PRB decided, the Deans could send the decision back until they got the holding that they desired.”
NYU also refused petitioner’s request for contact information for potential witnesses, including Meeker, even though he was no longer at NYU. Petitioner’s request to have Meeker, Hershkowitz, or Cornejo attend the hearing was also denied, even though their allegedly false statements were part of the Investigating Panel Report that formed the basis of the case against her.
These facts, fully set forth in the record, establish that NYU did not substantially comply with its own published guidelines and policies, whether judged under the 2005 Code or the 2009 Code. In violation of both codes, petitioner was not afforded substantial justice. Significantly, among other things, she was not given a fair opportunity to cross-examine her accusers, and key procedural rulings were made and/or influenced by Palatta. Under these circumstances, we need not remand to allow NYU to interpose an answer; we can annul the determination expelling petitioner (Matter of Tamsen v Licata, 94 AD3d 1566, 1569 [4th Dept 2012]). “Where, as here, the dispositive facts and the positions of the parties are fully set forth in the record, thereby making it clear that no dispute as to the facts exists and [that] no prejudice will result from the failure to require an answer, the court may reach the merits of the petition and grant the petitioner judgment thereon notwithstanding the lack of any *511 answer and without giving the respondent a further opportunity to answer the petition” (Matter of Kuzma v City of Buffalo, 45 AD3d 1308, 1311 [4th Dept 2007] [internal quotation marks omitted]).
The dissent disagrees and believes that CPLR 7804 (f) mandates that NYU be permitted to answer. While acknowledging that the Court of Appeals in Matter of Nassau BOCES Cent. Council of Teachers v Board of Coop. Educ. Servs. of Nassau County (63 NY2d 100, 102 [1984]) recognized an exception to the statutory mandate, the dissent finds that the exception does not apply because “[t]here are a number of disputed issues of fact in the record as presently developed, including, but not limited to, whether a 2005 or 2009 [C]ode of [E]thics governed the challenged disciplinary proceedings and whether petitioner falsified a patient’s chart.” However, as detailed above, the record establishes that NYU did not substantially comply with either the 2005 Code or the 2009 Code. Consequently, there is no need to remand to determine which code should have been applied. Further, given that NYU did not substantially comply with its own published guidelines, its determination must be annulled (see Matter of Hyman v Cornell Univ., 82 AD3d 1309, 1310 [3d Dept 2011], supra), and there is no need to review whether it was rationally based upon the evidence. In this regard, we note that it would be improper for NYU to produce the actual patient charts for the first time in the article 78 proceeding (see Matter of Kelly v Safir, 96 NY2d 32, 39 [2001]).
In light of the foregoing, there is also no need to determine whether the penalty of expulsion without possibility of readmission “is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one’s sense of fairness” (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 233 [1974] [internal quotation marks omitted]). Nevertheless, we feel compelled to express our view that even if NYU had substantially complied with its own guidelines and policies, we would find that the penalty of expulsion shocks one’s sense of fairness.
Under the 2009 Code of Ethics, authorized sanctions for misconduct include:
“a) Warning: Notice to the student in writing that continuation or repetition of the conduct found wrongful, or participation in similar conduct, within the period of time stated in the warning, shall be cause for disciplinary action.
“b) Censure: Written reprimand for violation of specified regulation, including the possibility of more severe disciplinary *512 sanction in the event of conviction for the violation within a period of time stated in the letter of reprimand.
c) Disciplinary probation: Exclusion from participation in privileges or extracurricular University activities as set forth in the notice of disciplinary probation for the specified period of time.
d) Restitution: Reimbursement for damage to or misappropriation of property. Reimbursement may take the form of appropriate service to repair or otherwise compensate for damages.
e) Extended suspension: Exclusion for classes and other privileges or activities as set forth in the notice of suspension for a specified period of time.
f) Dismissal from the College: Permanent termination of student status without the possibility of readmission.”
Petitioner’s academic performance at NYU dental college was exemplary, and this incident was at worst a single lapse in judgment in the face of extraordinary pressure. As Ploumis — who has been a member of NYU dental college for over 20 years— explained:
"In a moment of panic and desperation, Katie did something foolish and imprudent that blemished an otherwise spotless record. Her lapse was not premeditated ....
“The entire student body is aware of, and aghast at, the punishment. Every student and graduate I have spoken to has indicated that, given a similar set of facts and conditions, he or she could envision acting similarly in a moment of panic ....
“Decent people, compassionate institutions, don’t throw a student away on the eve of her graduation for one lapse.”
Furthermore, because petitioner was able to enter the dentistry program before completing her undergraduate degree, expulsion from NYU leaves her with no degree of any kind after seven years of educational toil and the expenditure of hundreds of thousands of dollars.
There are also extenuating circumstances, grounded in the Code of Ethics, that were not given the weight they were due. The 2005 Code and the 2009 Code both provide:
“Commitment of the Colleges to Students.
“The faculty, administration, and staff of the College will work to clarify academic requirements and provide assistance and mentoring for students in meeting expectations.”
On the record before us, it appears that NYU frustrated petitioner’s ability to complete her PMV requirements by giving *513 her patients to other students because she had already showed competency in performing certain dental procedures. Petitioner was not informed until the night before her graduation that she might not be able to graduate due to a problem with PMV credits. Hershkowitz and Meeker refused to give petitioner any patients so that she could fulfill the remaining $2,007 of her PMV requirement and allegedly led her to believe that all they were interested in was having the $2,007 show up on her PMV account.
Further, the punishment that NYU meted out to petitioner is allegedly harsher than the punishment it has given to similarly situated students. For example, the Annual Report of the Council on Ethics and Professionalism of the New York University College of Dentistry for 2008-09 states that a student who “violated the code by misrepresenting their [sic] clinical work” merely had to repeat the academic year. Similarly, petitioner said that Meeker told her on June 9, 2009 that “he had another student a couple of years ago do ‘something really bad’ and that student, a male, was still able to graduate. Dr. Meeker did not tell [petitioner] what the student had done, only that ‘it was much worse than what [she] did.’ ” Concur— Andrias, Saxe and Román, JJ.
Gonzalez, PJ., and DeGrasse, J, dissent in part in a memorandum by Gonzalez, PJ., as follows: Petitioner brought this CPLR article 78 proceeding to annul a determination of New York University (NYU) terminating her from its dental college. The appeal challenged the grant of respondent NYU’s preanswer motion to dismiss the petition.
I agree with the majority that dismissal was error and that the petition should be reinstated. However, it is my view that CPLR 7804 (f) requires us to permit respondent to serve and file an answer (see Matter of Bethelite Community Church, Great Tomorrows Elementary School v Department of Envtl. Protection of City of N.Y., 8 NY3d 1001 [2007]; Matter of Nassau BOCES Cent. Council of Teachers v Board of Coop. Educ. Servs. of Nassau County, 63 NY2d 100, 103 [1984]).
CPLR 7804 (f) mandates[5] that a respondent whose pre-answer motion to dismiss is denied be permitted to “answer, upon such *514 terms as may be just.” In Bethelite (8 NY3d at 1001-1002), the Court of Appeals reversed an order of this Court that granted an article 78 petition upon review of the denial of a pre-answer motion to dismiss. By granting the petition in this case, the majority is repeating precisely the same error that formed the basis of the Bethelite reversal.
The Court of Appeals has recognized an exception to the CPLR 7804 (f) mandate, where “the facts are so fully presented . . . that it is clear that no dispute as to the facts exists and no prejudice will result from the failure to require an answer” (Matter of Nassau BOCES, 63 NY2d at 102). In my view, this case does not fall within that exception (see Matter of Julicher v Town of Tonawanda, 34 AD3d 1217 [4th Dept 2006]).
There are a number of disputed issues of fact in the record as presently developed, including, but not limited to, whether a 2005 or 2009 code of ethics governed the challenged disciplinary proceedings and whether petitioner falsified a patient’s chart. Specifically, the June 17, 2009 annual report of the Council on Ethics and Professionalism (CEP) of NYU’s College of Dentistry seems to refute respondent’s assertion that disciplinary matters were no longer handled by CEP during the academic year in question.
Matter of Kelly v Safir (96 NY2d 32 [2001]), cited by the majority in support of an assertion that “it would be improper for NYU to produce the actual patient charts for the first time in the article 78 proceeding,” is inapplicable here. In Kelly, the Court of Appeals addressed the narrow scope of judicial review of penalties imposed after administrative hearings in two consolidated article 78 proceedings. Here, by contrast, there was no article 78 hearing. This appeal arises from the grant of a pre-answer motion to dismiss a petition that challenged both the penalty of expulsion and the manner in which NYU conducted a disciplinary proceeding.
Finally, the relief demanded in the petition includes a judgment directing respondent to reinstate petitioner as a student and to grant her a degree from the College of Dentistry as well as attorneys’ fees. Curiously, by today’s ruling, the majority grants all of the requested relief even though it acknowledges an issue as to whether petitioner falsified patient records as alleged in the underlying disciplinary proceeding.
Accordingly, I would vacate that portion of the order and judgment appealed from that dismissed the article 78 proceeding, reinstate the petition, and remand to Supreme Court to allow respondent to submit an answer and for further proceedings on the pleadings.

. Petitioner avers that student posts to Internet forums in 2010 say that NYU announced that “it will return its DDS degree to its original foundations in classroom work and procedural competencies, rather than fee-paid clinical work or PMV”

. Meeker has apparently left NYU under circumstances not explained by the record.

. The 2005 Code contains essentially the same clause, granting the powers to the Council, rather than the Board, and the analysis that follows would apply equally to that code.

. Notably, in the usual special proceeding, CPLR 404 (a) uses permissive language, stating that if a motion to dismiss the proceeding is denied, the court “may” permit a respondent to answer. By contrast, section 7804 (f) was specifically modified to include mandatory language, “shall,” indicating a “requir[ement\ that the respondent be given an opportunity to answer if the motion is denied” (5th Preliminary Rep of Advisory Comm on Prac and Pro, 1961 NY Legis Doc No. 15 at 755 [emphasis added]).