Matter of John Doe 1 v Syracuse Univ. (2020 NY Slip Op 06586)





Matter of John Doe 1 v Syracuse Univ.


2020 NY Slip Op 06586


Decided on November 13, 2020


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on November 13, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CENTRA, J.P., PERADOTTO, NEMOYER, CURRAN, AND WINSLOW, JJ.


530 CA 19-01226

[*1]IN THE MATTER OF JOHN DOE 1, ET AL., PETITIONERS, JOHN DOE 3, JOHN DOE 7 AND JOHN DOE 8, PETITIONERS-APPELLANTS,
v
SYRACUSE UNIVERSITY, RESPONDENT-RESPONDENT. 






DANIELLE C. WILD, ROCHESTER, FOR PETITIONERS-APPELLANTS. 
HANCOCK ESTABROOK, LLP, SYRACUSE (JOHN G. POWERS OF COUNSEL), FOR RESPONDENT-RESPONDENT.
RANDAZZA LEGAL GROUP, PLLC, LONG ISLAND CITY (JAY M. WOLMAN OF COUNSEL), FOR FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, AMICUS CURIAE. 


 Appeal from a judgment (denominated order) of the Supreme Court, Jefferson County (James P. McClusky, J.), entered January 8, 2019 in a CPLR article 78 proceeding. The judgment denied in part the petition. 
It is hereby ORDERED that the judgment so appealed from is affirmed without costs.
Memorandum: John Doe 3, John Doe 7, and John Doe 8 (petitioners) were among several other pledging members of the Theta Tau fraternity chapter (Chapter) at respondent, Syracuse University, who, in late March 2018, participated in a videotaped roast of current members before an assembled group of fraternity members in the basement of the Chapter house. The skits performed as part of this event, which were apparently attempts at satire, included dialogue in which students professed hatred for persons of certain races, ethnicities, and religions while using slurs to refer to those groups, and depictions of simulated sexual activity and sexual violence directed at persons imitating women and a disabled individual. The videotaped performances were subsequently posted online to the Chapter's private Facebook group. A few weeks later, a female student was granted access to the Facebook group, viewed and recorded the videos, and sent the videos to respondent's administrators and its student-run newspaper. The announcement of respondent's Chancellor disclosing the existence and describing the content of the videos and the subsequent release of an edited video clip by media outlets, including the student-run newspaper, resulted in campus-wide demonstrations, protests, and outrage. Open forums were held the same day—including one in the evening during which time the first video clip was released by the media—in which students, many of whom identified with marginalized groups, expressed the effect that petitioners' reported and depicted conduct had on them. Campus unrest continued over the following days, and a second edited video clip was also released by the media.
Following an investigation, petitioners and other pledging members of the Chapter were charged with various violations of respondent's Code of Student Conduct (Code). Petitioners appeared before the University Conduct Board (UCB) for a group disciplinary hearing, and the UCB thereafter found petitioners responsible for certain violations of the Code and recommended sanctions that included indefinite suspensions of one or two years with eligibility for readmission requiring a petition and completion of certain conditions. On administrative appeal, the University Appeals Board (UAB) upheld the UCB's decision, and the UAB determination was confirmed by respondent's representative.
Petitioners thereafter commenced this CPLR article 78 proceeding seeking to annul respondent's final determinations. Supreme Court granted the petition in part and denied the petition in part by upholding the final determinations to the extent that respondent found petitioners responsible for Code violations under Section 3 prohibiting conduct that threatens the mental health, physical health, or safety of any person or persons and under Section 15 prohibiting the violation of other university policies such as the guidelines of the Office of Fraternity and Sorority Affairs (FASA). The court also upheld the sanctions imposed against petitioners. Petitioners now appeal, and we affirm.
It is well settled that "the relationship between a private university and its students is essentially a private one such that, absent some showing of State involvement, [its] disciplinary proceedings do not implicate the full panoply of due process guarantees" (Matter of A.E. v Hamilton Coll., 173 AD3d 1753, 1754 [4th Dept 2019] [internal quotation marks omitted]; see Matter of Kickertz v New York Univ., 25 NY3d 942, 944 [2015]). " 'Judicial scrutiny of the determination of disciplinary matters between a university and its students, or student organizations, is limited to determining whether the university substantially adhered to its own published rules and guidelines for disciplinary proceedings so as to ascertain whether its actions were arbitrary or capricious' " (Matter of Al-Khadra v Syracuse Univ., 291 AD2d 865, 866 [4th Dept 2002], lv denied 98 NY2d 603 [2002]; see A.E., 173 AD3d at 1754-1755; see generally Tedeschi v Wagner Coll., 49 NY2d 652, 660 [1980]). "Perfect adherence to every procedural requirement is not necessary to demonstrate substantial compliance" (Matter of Doe v Skidmore Coll., 152 AD3d 932, 935 [3d Dept 2017] [hereafter, Skidmore Coll.]). "A university's determination will be annulled only where it has failed to substantially comply with its procedures or where its determination lacks a rational basis" (Matter of Doe v Cornell Univ., 163 AD3d 1243, 1245 [3d Dept 2018] [hereafter, Cornell Univ.]; see Matter of Ponichtera v State Univ. of N.Y. at Buffalo, 149 AD3d 1565, 1565-1566 [4th Dept 2017]).
We reject petitioners' contention that respondent failed to substantially adhere to its own published rules and guidelines for disciplinary proceedings. Contrary to petitioners' assertion, the record establishes that respondent substantially complied with its procedures in providing petitioners timely and adequate notice of the charges against them (see Matter of Lampert v State Univ. of N.Y. at Albany, 116 AD3d 1292, 1294 [3d Dept 2014], lv denied 23 NY3d 908 [2014]). Petitioners' contentions with respect to the use of a group disciplinary hearing format are likewise without merit because petitioners were provided notice that there would be a single hearing for all pledging members identified in the investigation (see Matter of Beilis v Albany Med. Coll. of Union Univ., 136 AD2d 42, 44 [3d Dept 1988]), and the Code does not preclude respondent from conducting the hearing in the group manner employed here (see Matter of Shah v Union Coll., 97 AD3d 949, 951 [3d Dept 2012]).
Petitioners also contend that respondent failed to substantially comply with its procedures by improperly applying the rules governing the questioning of the investigator at the hearing. That contention is without merit. Here, "the right of confrontation or cross-examination is not directed or guaranteed under respondent's procedures"; instead, the Code provides a limited right to submit proposed questions to witnesses indirectly through the UCB, which is granted discretion via its chairperson to determine whether and the extent to which, based on reasonableness and relevance, such questions are posed to witnesses (Cornell Univ., 163 AD3d at 1245; see Matter of Weber v State Univ. of N.Y., Coll. at Cortland, 150 AD3d 1429, 1432 [3d Dept 2017]). Contrary to petitioners' contention, the record establishes that respondent substantially complied with this procedure inasmuch as petitioners were permitted to pose many questions to the investigator, even though the UCB exercised its discretion in precluding certain questions (see Cornell Univ., 163 AD3d at 1245).
Petitioners further contend that respondent failed to substantially comply with its procedures when the UCB denied their request to call certain witnesses. That contention lacks merit. The Code provides that "[e]ach party will have the opportunity to present relevant testimony" and that the "[r]elevance of testimony will be determined by the respective [UCB] chairperson." Here, the UCB determined that the information sought to be elicited from petitioners' proposed witnesses was "procedural and not factual" and that, inasmuch as the UCB's function was to hear factual information relevant to the subject events to determine whether the Code was violated, the opinions of anyone else about what charges should apply were "not relevant." That evidentiary determination was a discretionary one reserved by the [*2]Code for the UCB and, therefore, petitioners' contention that respondent failed to substantially comply with its procedures in that regard is without merit (see Matter of Hyman v Cornell Univ., 82 AD3d 1309, 1310 [3d Dept 2011]).
Contrary to petitioners' additional contention, respondent substantially complied with its procedures when petitioners were permitted to "present objections to the participation of any [UCB] member for reason of conflict of interest" (see generally Weber, 150 AD3d at 1433). Moreover, the UCB adequately ruled on those objections, and there is no indication in the record that any of the UCB members had predetermined the issues (see Skidmore Coll., 152 AD3d at 933-934; Weber, 150 AD3d at 1433-1434; Shah, 97 AD3d at 951).
Petitioners also contend that respondent did not substantially comply with its procedures because the UAB failed to timely render a decision on their administrative appeals or timely indicate in writing that its decision would be delayed. Although we agree with petitioners that the UAB failed to respond within the requisite three business days, we nonetheless conclude that respondent " 'substantially adhered to the time frame' of its [appeal] resolution process by responding to the [administrative appeals] within [eight business] days of [their] submission" with letters indicating that, in light of the quantity of the materials it had to review, the UAB required additional time to make a final decision (Matter of Krysty v State Univ. of N.Y. at Buffalo, 39 AD3d 1220, 1220 [4th Dept 2007], lv denied 9 NY3d 805 [2007]).
Petitioners failed to preserve for our review their remaining contentions regarding respondent's alleged failure to adhere to its procedures, and we have no discretionary authority to review those contentions in this CPLR article 78 proceeding (see Matter of Khan v New York State Dept. of Health, 96 NY2d 879, 880 [2001]; Matter of Sharma v State Univ. of N.Y. at Buffalo, 170 AD3d 1565, 1567 [4th Dept 2019]; Krupa v Stanford, 145 AD3d 1656, 1656 [4th Dept 2016]).
Next, petitioners correctly note that respondent promises its students a general "right to fundamental fairness" in the disciplinary process. However, "[t]he 'fundamental fairness' promised by this private university's disciplinary rules is circumscribed by the . . . processes and limitations described therein, and was not intended to afford petitioner[s] the full panoply of due process rights" (Matter of Ebert v Yeshiva Univ., 28 AD3d 315, 315 [1st Dept 2006]). Petitioners take issue with the Chancellor's initial statements to the university community in which he, among other things, advised that respondent had "launched a formal investigation to identify individuals involved and to take additional legal and disciplinary action" against them, characterized the behavior purportedly depicted in the videos as "unacceptable" and contrary to respondent's moral standards, and warned that "[w]hat happened at [the Chapter] serves as a reminder that violations of codes of honor, behavior and values will be met with swift and appropriate consequences." Contrary to petitioners' contention, we conclude that, while aspects of the process were imperfect, including portions of the Chancellor's remarks that risked creating the appearance of predetermination in a pending investigation and disciplinary process, respondent nonetheless "proceeded in accordance with [its disciplinary] rules, which it 'substantially observed,' " and it cannot be said on this record that petitioners were deprived of the fundamentally fair process to which they were entitled (id.; cf. Skidmore Coll., 152 AD3d at 939; see generally Matter of Hill v State Univ. of N.Y. at Buffalo, 163 AD3d 1454, 1455 [4th Dept 2018]). Petitioners' related assertion that respondent added the Title IX charges in order to manipulate in its favor the procedures that would apply is, as petitioners acknowledge, based on speculation, and that assertion thus provides petitioners with no basis for obtaining relief (see Ebert, 28 AD3d at 316).
With respect to petitioners' contention regarding free speech, the parties agree that respondent, as a private university, is not directly bound by the protections afforded by the First Amendment of the United States Constitution (see generally Rendell-Baker v Kohn, 457 US 830, 837 [1982]; Weise v Syracuse Univ., 553 F Supp 675, 681-682 [ND NY 1982]; Mitchell v New York Univ. ["NYU"], 129 AD3d 542, 544 [1st Dept 2015], lv denied 26 NY3d 908 [2015]). Moreover, we conclude that the relevant policy governing student rights and responsibilities does "not expressly or impliedly adopt a First Amendment standard governed by [related] case law and make it applicable to the university as a private entity" (Bilicki v Syracuse Univ., 67 Misc 3d 1230[A], 2019 NY Slip Op 52178[U], *6 [Sup Ct, Onondaga County 2019], affd for reasons stated 181 AD3d 1188 [4th Dept 2020]). Instead, the subject policy provides that respondent's [*3]"[s]tudents have the right to express themselves freely on any subject provided they do so in a manner that does not violate the Code of Student Conduct." Inasmuch as the right of free speech that respondent promises to its students is limited in that manner, the inquiry remains whether the speech at issue here violated the Code.
In that regard, petitioners contend that respondent's disciplinary determinations were arbitrary and capricious because there was no rational basis on which to conclude that their conduct threatened the mental health, physical health, or safety of any person as charged under Section 3 of the Code or that their individual conduct violated the FASA guidelines as charged under Section 15 of the Code. We reject that contention. Where, as here, " 'a university, in [suspending] a student, acts within its jurisdiction, not arbitrarily but in the exercise of an honest discretion based on facts within its knowledge that justify the exercise of discretion, a court may not review the exercise of its discretion' " (Ponichtera, 149 AD3d at 1566, quoting Matter of Carr v St. John's Univ., N.Y., 17 AD2d 632, 634 [1962], affd 12 NY2d 802 [1962]; see Matter of Powers v St. John's Univ. Sch. of Law, 25 NY3d 210, 216 [2015]).
With respect to the particular violations at issue, a student violates Section 3 of the Code by engaging in "[c]onduct—whether physical, verbal or electronic, oral, written or video—which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying or other forms of destructive behavior." Here, respondent's determination that petitioners' conduct—i.e., participating in videotaped performances at a roast that included dialogue professing hatred for persons of certain races, ethnicities, and religions, the use of slurs to refer to those groups, and the depiction of simulated sexual activity and sexual violence directed at persons imitating women and a disabled individual—threatened the mental health of persons in the university community is rationally supported by the record (see Cornell Univ., 163 AD3d at 1246-1248; Ponichtera, 149 AD3d at 1566; Hyman, 82 AD3d at 1310). Petitioners' related contention that it was unreasonable for respondent to hold them responsible for conduct that they did not intend to cause harm is likewise without merit. Respondent's interpretation of Section 3 as containing no requirement that a student intend the conduct to cause a harmful result "is neither unreasonable nor irrational" (Hyman, 82 AD3d at 1310; see generally Matter of Agudio v State Univ. of N.Y., 164 AD3d 986, 990 [3d Dept 2018]; Matter of Katz v Board of Regents of the Univ. of the State of N.Y., 85 AD3d 1277, 1279 [3d Dept 2011], lv denied 17 NY3d 716 [2011]).
Contrary to petitioners' contention with respect to their violation of Section 15 of the Code, it "is neither unreasonable nor irrational" (Hyman, 82 AD3d at 1310) for respondent to interpret the FASA guidelines as proscribing both chapters and individual members from tolerating or condoning "any form of sexist or sexually abusive behavior," including "any actions, activities or events . . . which are demeaning to women or men," inasmuch as the FASA guidelines expressly provide that they "shall apply to all fraternity/sorority entities and all levels of fraternity/sorority membership." Further, respondent rationally concluded that petitioners violated the subject provision by participating in a production that included sexist portrayals of women and simulated sexual assault, thereby condoning a form of sexist and sexually abusive behavior during a fraternity activity or event that was demeaning to women (see Cornell Univ., 163 AD3d at 1246-1248; Ponichtera, 149 AD3d at 1566; Hyman, 82 AD3d at 1310).
Finally, contrary to petitioners' contention, we conclude that the sanctions imposed on each of them are not "so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness" (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 233 [1974] [internal quotation marks omitted]; see Powers, 25 NY3d at 218; Lampert, 116 AD3d at 1294).
All concur except NeMoyer, J., who dissents in part and votes to modify in accordance with the following memorandum: At the outset, let me begin with an important disclaimer: in no way do I condone, support, or approve of the sentiments depicted on the videos that sparked this case. Petitioners' videotaped behavior is fairly characterized as offensive, boorish, immature and sophomoric, and a private university unconstrained by the First Amendment could rationally decide to penalize petitioners for the hazing manifested by such conduct (see generally Mitchell v New York Univ. ["NYU"], 129 AD3d 542, 544 [1st Dept 2015], lv denied 26 NY3d 908 [2015]). And while petitioners' "trial" was little more than a sham proceeding convened to reach a pre-[*4]ordained result, any judicial relief on that basis is foreclosed by the absence of constitutional due process protections for private disciplinary proceedings, together with the rigorous standard of review applicable to CPLR article 78 petitions. I am therefore constrained to agree with my colleagues that petitioners' suspensions for violating Section 15 of respondent's Student Code of Conduct (Code) should be upheld.
But there is one aspect of this case that I cannot reconcile with the applicable law, namely, respondent's decision to convict petitioners of violating Section 3 of the Code. Insofar as relevant here, Section 3 empowers respondent to punish any student for "[a]ssistance, participation in, promotion of, or perpetuation of conduct—whether physical, verbal[,] electronic, oral, written or video—which threatens the mental health . . . of any person or persons" (emphasis added). What on earth does that actually mean? More specifically, what does "mental health" mean in this context? Does it require some nexus to a recognized DSM condition diagnosed by a trained professional, or does the term "mental health" in Section 3 encompass any emotive discomfort or intellectual displeasure experienced by a person who objects to, disagrees with, or is offended by the "physical, verbal[,] electronic, oral, written or video" conduct at issue? Whatever it might encompass, the term "mental health" is clearly ambiguous and fails to provide any intelligible guidance by which reasonable students could tailor their conduct to avoid liability.
And what does Section 3 mean by "threaten"? Must the "threat" be directly communicated to or targeted at another person, or can a statement made in confidence between willing conversants be deemed to have "threatened" the mental health of a third person who learns of the statement months or years after the fact? Must the perpetrator have intended to "threaten" another person? Indeed, from whose perspective is the existence of a "threat" even measured? Is it an objective standard based on the understandings of a reasonable person, or is the accused guilty whenever anyone feels threatened based on his or her subjective impressions of the accused's conduct — even if the claimed feeling is wholly irrational and untethered from any objective conception of threatening conduct?
In practice, all of my concerns about Section 3 can be distilled to one essential point: does that provision create any distinction between speech that merely offends and speech that truly harms another person's psychological, psychiatric, or neuro-cognitive functioning? Assuming that respondent would even recognize such a distinction in the abstract (and unfortunately, given the complete absence of any proof in this record that petitioners' conduct actually harmed anyone, I cannot take that proposition for granted), then how does Section 3 channel the factfinder's discretion so as to punish only the latter and not the former? To my mind, Section 3 fails miserably at that critical task. Indeed, the staggering breadth of the provision is matched only by its indefiniteness, and it effectively serves as a systemic instrument for the suppression of any viewpoint that falls outside the zone of permissible opinion decreed by the most strident and self-righteous of the campus community. To convict petitioners under such a vague and standardless diktat is, to my mind, the very embodiment of arbitrary and capricious administrative decision-making that should be annulled under CPLR article 78 (see Matter of Nicholas v Kahn, 47 NY2d 24, 33-34 [1979]; Matter of Law Enforcement Officers Union, Dist. Council 82, AFSCME, AFL-CIO v State of New York, 229 AD2d 286, 292 [3d Dept 1997], lv denied 90 NY2d 807 [1997]). Put simply, "[b]eing subjective and in the absence of objectivity, [Section 3 is] unreasonable and arbitrary and therefore invalid" as a predicate for disciplining petitioners (Matter of Levine v Whalen, 39 NY2d 510, 519 [1976]). I would therefore modify the judgment by granting that part of the petition seeking to annul respondent's determinations with respect to Section 3 of the Code. From the majority's contrary conclusion, I respectfully dissent.
Entered: November 13, 2020
Mark W. Bennett
Clerk of the Court